In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 09-2863, 09-2864, 09-3231, 09-3232,
09-3347, 09-3603 & 09-3653

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARIANO MORALES, ARTURO BARBOSA,
MIGUEL RODRIGUEZ, BRIAN HERNANDEZ,
LIONEL LECHUGA, HAROLD CROWDER,
and ROMEL HANDLEY,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 90—**Harry D. Leinenweber**, *Judge.*

ARGUED MARCH 28, 2011—DECIDED AUGUST 18, 2011

Before KANNE, SYKES, and HAMILTON, *Circuit Judges.*

KANNE, *Circuit Judge.* In 2002, state and federal authori-
ties began an intensive investigation into gang violence
in Aurora, Illinois. Their investigation centered on the
Insane Deuces street gang, as one member had agreed to

serve as a confidential informant for local authorities. Mariano Morales, Arturo Barbosa, Miguel Rodriguez, Brian Hernandez, Lionel Lechuga, Harold Crowder, and Romel Handley (collectively, the "Defendants") all participated in the gang's activities. They were among sixteen individuals indicted by a federal grand jury on various racketeering-related charges in 2006. After the trial was bifurcated, the seven Defendants stood trial together and were each convicted of racketeering conspiracy; some were also convicted of related charges, including narcotics distribution and conspiracy, illegal firearm possession, and assault and murder in furtherance of their racketeering activities. Once proud, self-identifying Deuces banging on the street, each now tries to distance himself from the gang and claims to have been only tangentially involved in its activities, if at all. The Defendants present three joint and fourteen individual issues, alleging errors in both the guilt and sentencing phases of their trial. Finding that their arguments lack merit or that the errors alleged were harmless, we affirm their convictions and sentences.

## I. BACKGROUND

The Defendants were members or confederates of the Insane Deuces, a street gang with a heavy presence in northeastern Illinois in the previous decade. With the help of a gang member seeking to avoid prosecution following an arrest, local and federal authorities gathered information on the Insane Deuces and tried to dismantle

the gang in Aurora, Illinois, where gang-related violence had soared in the early 2000s. Today we resolve two appeals arising from trials based upon those efforts: this case and its companion case, *United States v. Benabe*, No. 09-1190, slip op. (7th Cir. Aug. 18, 2011). We will briefly describe the background of the gang and its activities before discussing the proceedings leading to the current appeal.

*A. About the Gang*

The Insane Deuce Nation ("Insane Deuces," "Deuces," or the "Nation") is an organized street gang affiliated with the Folks, a national network of various local gangs. Recently, the gang has been predominantly composed of Latino/Hispanic males and has operated primarily within northern Illinois, though factions exist throughout Illinois and various state and federal prisons. Cities in northeastern Illinois had individual chapters under the umbrella of the Nation and its centralized leadership. This case involves the Aurora Deuces, a chapter with a significant presence in Aurora, Illinois.

A loose association between the Insane Deuces and the Latin Kings, a gang affiliated with the Peoples network, had evaporated before the events in this case occurred. By 2002, the Deuces and Kings were bitter rivals fighting for control of Aurora's streets. The rivalry resulted in frequent and escalating violence, often leading to attacks against victims mistaken for rival gang members. This inter-gang violence precipitated the investigation leading to this case.

The Deuces comprised at least three tiers of membership: Seniors, Juniors, and Shorties. Shorties were the gang's youngest full members. They bore responsibility for executing most of the gang's activities, including carrying out violent acts and selling narcotics to fund the gang. They were often juveniles, recruited in their youth to build the gang's ranks while minimizing criminal liability. By participating in gang activities, young members could become Juniors. Juniors were responsible for daily Deuce operations. They directed the Shorties' activities and planned narrow-scale operations, determining which Shorties would participate, assigning responsibilities and distributing firearms to them, and supervising their activities. The Seniors were long-standing members of the gang whose age and accomplishments made them the leaders, broad-scope planners, and advisors for the gang. They directed the Juniors but were often removed from the Deuces' daily activities. The local chapter in Aurora was organized at the Junior level, likely due to the ongoing incarceration of the local Seniors.

Each tier in the Deuces had its own leadership structure where three members in each tier bore a title and increased responsibilities. The highest rank in each tier was the "First Seat" or "Governor" who was responsible for the overall activities of that group. The "Second Seat" or "Lieutenant Governor" assisted in directing activities within the tier, often assigning missions. The third-ranking member, or "Enforcer," was responsible for ensuring compliance with the gang's disciplinary codes and for

administering "violations" (punishments) to members who broke the gang's "leyas" (laws) or failed to participate in its activities.

The Deuces' daily activities included dealing narcotics to benefit the gang, going on "missions" (planned attacks on rival gang members), protecting and supporting fellow gang members and their families, punishing gang members who violated the gang's codes, and meeting to coordinate these efforts. To facilitate their activities, the Deuces maintained a "caja" system, a loose form of community property and money acquired for the benefit of gang members. For example, if a Deuce was arrested and held pending trial, other members would take money from the caja to post bail for him. The caja also included a quantity of narcotics from which a member could borrow to make sales or trades for the benefit of the Nation. Although the Deuces were allowed to buy and sell drugs in a "free enterprise" system—sales could be conducted from sources outside of the Nation—all sales needed to benefit the Nation in some way, typically by paying a portion of the proceeds into the caja. Alternatively, profits from sales could be used to purchase firearms to donate to the gang. These "Nation guns" would then be used in carrying out missions or protecting members; the guns would be returned to the caja after the mission for later use (unless disposed of to avoid ballistics evidence in the event of a murder).

Participation was compulsory for Juniors and Shorties, including those members who were rolled back from

Senior to Junior status in an effort to better train, lead, and supervise the Deuces' swelling Shorty ranks. Every Junior and Shorty had to pay periodic dues into the caja to support the gang's activities. Missions were specifically assigned to gang members and usually consisted of planned attacks directed against specific rival gang members in retaliation for violence or territorial encroachment. Nation guns would be distributed for the mission along with orders to empty the magazine or bear violations for every bullet not fired. In addition to missions, all members were expected to comply with a standing order to attack Latin Kings whenever the opportunity arose. Participation in missions, other acts of violence, and donations of money, contraband, or firearms to the caja through drug sales or theft led to advancement within the organization. In exchange for these efforts, Deuces and their families received financial support and physical protection; these benefits extended to both Deuces on the streets and those who were incarcerated in various facilities throughout Illinois.

### B. *The Investigation*

Following a drug raid on Junior Enforcer Orlando Rivera's home in early 2002, Rivera absconded, and a warrant issued for his arrest. After two months, he was arrested pursuant to the warrant and was looking to avoid prosecution. He therefore began cooperating with local and federal authorities investigating the Deuces. He surreptitiously recorded gang meetings and conversa-

tions, he pretended to discard Nation guns only to hide them and later turn them over to authorities, he reported the gang's activities and plans, and he received money to conduct controlled buys of narcotics and firearms from gang members. The intelligence gathered through Rivera produced evidence on four murders, eleven attempted murders, two solicitations to commit murder, other shootings, and narcotics distribution incidents—all of which the Deuces perpetrated in 2002 alone. In exchange for his services, Rivera received full immunity for his activities with the Deuces, and the government relocated and compensated him.

Through Rivera's cooperation and information arising from it, government authorities learned about each of the Defendants' roles and general scope of participation in the Deuces' criminal activities. We briefly relate some of that background information here.

- Morales joined the gang in 1986 while in his early teens, and he carried out shootings and narcotics sales to move up in the Nation. He'd risen to a leadership position and helped craft the gang's leyas, including the standing order to kill Latin Kings on sight. By 2002 he was a Senior, but was rolled back to Junior status during the Deuces' reorganization. He became the Junior Enforcer, the third highest rank in the Aurora Deuces; he expressed support for the change, noting that it was "the best thing that happened."

- Barbosa was a long-standing Insane Deuce who immediately resumed his gang activities when released from prison in 2002. He personally approved of murdering his cousin, a rival gang member, and attempted to murder a Deuce the leadership erroneously believed to be cooperating with police. He encouraged the leadership to be more active in training the Shorties to be ready to carry out missions so the gang could gain control of the city. He also flatly stated his intention for the gang to kill rivals: "You see one, you do his ass. Plain and simple."

- Rodriguez was also a Senior before being rolled back to Junior status in 2002. Coming up in the Deuces, he attempted to kill rivals and distributed drugs for the gang's benefit. He had assisted in developing the leyas and assigned missions to Shorties. After being rolled back, he advocated murdering members of the rival Ambrose street gang en masse and murdering whoever had been cooperating with the police from within the Deuces.

- Hernandez joined the Deuces between the ages of 12 and 17, and he had risen to the Junior ranks by 2002. As a supervisor for the Shorties, he hosted meetings at his house, sent them out on missions, provided them with firearms for the missions, and handled viola-

tions if they failed to comply with his orders. He had been personally involved in at least three shootings that former gang members testified about at trial. He also was recorded requesting cocaine from the caja for himself and his cousin.

- Lechuga was another older Deuce who had been rolled back to Junior status. The record shows conflicting accounts of his previous status: he asserts that he was retired and that he was pulled back in when Deuce leadership raised the retirement age to 35, but contrary evidence indicated that he was a Senior Deuce prior to the rollback. Regardless, he was upset with the manner of the rollback, but nevertheless did resume active participation in the gang's affairs. He also noted that he'd remained willing to be involved while in retired or Senior status. He counseled Deuce leaders on how best to carry out inter-gang warfare within the Folks network without risking their ability to protect their members in prison. He also advocated changes in the caja system to increase efficiency in fronting drugs to gang members, perhaps as a result of his being unable to obtain from an enforcer the cocaine he'd requested for resale in July 2002.

- Crowder held privileges in the Aurora Deuces, though he had not come up in the gang. He

>   was a defector from the Gangster Disciples
>   and had come to the Deuces in late 2001 to
>   serve as a shooter on gang missions. He ful-
>   filled—indeed, exceeded—that role, attempting
>   to murder rival gang members and shooting
>   individuals he erroneously believed to be
>   Latin Kings.

- Handley declared to an Aurora police officer
  that he'd been "a King killer and a Deuce all
  [his] life." According to Rivera's testimony,
  Handley was the Shorty Enforcer in Aurora
  at the time of the events in this case, assigning
  missions to Shorties and storing firearms for
  the missions at his home. He was involved
  in at least three of the gang's attempted mur-
  ders (either driving stolen cars during the
  missions or personally firing on rivals). At
  some point, however, Handley lagged in his
  participation, and the gang's leadership or-
  dered other members to beat Handley if they
  found him during the summer of 2002.

The investigation likewise revealed information about the participation of other gang members, including those whose activities are described in a companion case we decide today. *See Benabe*, slip op. at 5-6. After months of fruitful investigation, the authorities decided to move forward with their attempt to dismantle the Insane Deuces in Aurora.

*C. Proceedings Below*

A federal grand jury indicted sixteen individuals alleged to be Deuces on charges of racketeering conspiracy; assault with a dangerous weapon, murder, attempted murder, and conspiracy to commit murder, all in aid of racketeering activities; illegal possession of firearms; and distribution and possession with intent to distribute narcotics (and conspiracy to do the same). The indictment described the Deuce organization as a racketeering enterprise and laid out some of the events comprising its pattern of racketeering activities. One of the indicted individuals pled guilty, and another remained at large. Nine of the remaining fourteen individuals moved for severance, requesting either individual trials or small group trials. Given the amount of briefing and argumentation, the challenges to juries inherent in lengthy and overtly complex trials, and the logistics of trying such a large group in a single courtroom, Judge Castillo severed the case into two trials. He grouped the Defendants together in the second of two near-simultaneous trials, describing them as "the less major players," as compared to the "alleged leaders of the conspiracy" comprising the group in the first trial (the "*Benabe* trial").[1]

---

[1] Crowder was initially grouped with the first set of defendants and stood trial with them, but that jury was unable to reach a verdict as to him. On the government's motion, he was retried with the second group to stand trial. Accordingly, he is among the Defendants in this appeal.

Judge Leinenweber commenced the Defendants' trial (after an earlier attempt that ended in a mistrial) in October 2008. On the government's motion, the district court empaneled an anonymous jury. The Defendants had objected to the motion, and the district court heard arguments before ruling. It also had the luxury of considering Judge Castillo's extensive reasoning and experiences in the *Benabe* trial before ruling. The district court determined that the circumstances warranted an anonymous jury and that any prejudice could be effectively mitigated through jury instructions and comments during voir dire. The venire members were told that their identifying information was withheld to protect their privacy and prevent any party or trial participant from contacting them.

During the course of the three-month trial, the government presented witness testimony, recordings of Deuce meetings, and forensic evidence establishing the gang's activities, ideology, and purpose. One of the witnesses, Rivera (the Deuce turned confidential informant), had surreptitiously recorded gang meetings and conversations, performed controlled buys, and turned over evidence that other Deuces had expected him to destroy or dispose of on the gang's behalf. He testified over four days as to the inner workings of the gang, explaining what was said in meetings, identifying participants and speakers, and describing the gang's organization and enforcement means. Two other former Deuces, Lorenzo Becerra and Akeem Horton, also testified regarding the gang's activities and individuals' scope of participation.

The government also presented testimony from twenty-four police officers, eleven federal agents, and seven victims.

The jury returned its initial verdicts a week after the Defendants concluded their closing arguments, finding each of the Defendants guilty of racketeering conspiracy. It also found Barbosa guilty of conspiracy to commit murder, and it found Barbosa, Morales, Rodriguez, Hernandez, and Lechuga guilty of distribution of narcotics. By contrast, the jury acquitted Morales of conspiracy to commit murder and was unable to reach a verdict on the charges against Steven Perez; the district court declared a mistrial as to Perez. On the court's instructions, the jury then returned special verdicts as to each defendant it had found to be guilty; the special verdicts were highly individualized, differentiating between the defendants on shared counts.

Before the special verdict phase, however, the district court received a note from a juror. The juror warned that some of the jurors had been discussing the case amongst themselves prior to deliberations, in contravention of the court's standing instructions. The Defendants moved for a mistrial, but the district court delayed ruling on the motion until written motions and arguments were submitted. It ultimately determined that a hearing was unnecessary, denied the mistrial motion, and proceeded to further jury deliberations.

Several of the Defendants filed post-trial motions in March 2009 challenging various aspects of their con-

victions, including the sufficiency of the evidence pre-
sented at trial, and requesting judgments of acquittal.
All of the Defendants filed post-trial motions requesting
new trials on various grounds. In a consolidated ruling,
the district court denied all of the post-trial motions in
May 2009. The Defendants then proceeded to sentencing.
Morales, Hernandez, and Rodriguez were imprisoned
for life. Barbosa was sentenced to 480 months' imprison-
ment. Handley and Lechuga were sentenced to 240
months' imprisonment. Finally, Crowder was sentenced
to 177 months' imprisonment. Each of the Defendants
timely appealed.

## II. ANALYSIS

The Defendants appeal several aspects of their convic-
tions and sentences. Taking full advantage of our
leniency in allowing both joint and individual briefs, the
Defendants filed a virtual cannonade of briefing, ex-
ceeding 280 pages in total. Their opening salvo is a joint
brief presenting three issues. The Defendants collectively
argue that the alleged errors apply to them all and that
each error requires reversal of their convictions. Each of
the Defendants (other than Barbosa) then fires an inde-
pendent volley attacking his own conviction, sentence,
or both. We will address the jointly presented issues
first, then we will consider each appellant in sequence.

*A.  Issues Presented by all Defendants*

The Defendants jointly contend the district court committed three errors that require us to reverse their convictions. First, the district court maintained juror anonymity during empanelment and throughout the trial. The Defendants argue both that the anonymous venire undermined the effectiveness of their voir dire and peremptory challenges and also that the anonymity caused the seated jury to be prejudiced against them. Second, the district court denied severance motions made by several of the Defendants. They argue that being required to stand trial together led to evidentiary spillover and undue lengthening of the trial, both of which prejudiced the jury against individual defendants. Third, the district court did not conduct a hearing to explore the extent of the jury's alleged premature deliberations. The Defendants argue that the jurors' discussions deprived them of a fair trial. We will analyze each of these issues in turn.

*1.  Anonymous Jury Empanelment*

An "anonymous jury" is selected from a venire whose members' identifying information—such as names, occupations, addresses, exact places of employment, and other such facts—has been withheld from the parties in order to protect potential jurors and their families. *United States v. Crockett*, 979 F.2d 1204, 1215 n.10 (7th Cir. 1992). Empaneling an anonymous jury "raises the specter that the defendant is a dangerous person from whom the

jurors must be protected" and potentially deprives defendants of information that could be used in making juror selections during voir dire. *United States v. Mansoori*, 304 F.3d 635, 650 (7th Cir. 2002) (*quoting United States v. Ross*, 33 F.3d 1507, 1519 (11th Cir. 1994)). Accordingly, the use of anonymous juries is discouraged, and courts should be "highly circumspect in ordering the empanelment of anonymous juries." *Ross*, 33 F.3d at 1522. But we have never held that it is presumptively inappropriate to rely on anonymity. If the district court concludes both that the circumstances strongly suggest that the jury needs protection and also that reasonable precautions—such as preliminary comments to the venire and instructions before deliberations—can mitigate any prejudice to the defendants, an anonymous jury may be empaneled. *Crockett*, 979 F.2d at 1216-17.

Over the Defendants' objection, the district court granted the government's motion for an anonymous jury in this case, withholding the names, addresses, and other identifying information of the members of the venire. The district court did not enter its findings on the record, but instead ordered an anonymous jury from the bench: "I believe that is correct. So I am going to order an anonymous jury over the objection of all the defendants." (Tr. 3/18/08 at 11.) The Defendants argue on appeal that the lack of explicit findings renders the empaneling inherently erroneous for two reasons. First, they contend that an on-the-record determination of why an anonymous jury is necessary is fundamental to protecting their rights to a fair trial and an impartial jury.

Second, they contend that any reliance on Judge Castillo's reasoning in the *Benabe* trial was inappropriate in this case because his reasons were not mentioned by the district court and are not part of the record on appeal. We review the decision to use an anonymous jury only for an abuse of discretion, *Mansoori*, 304 F.3d at 650, remaining particularly deferential to the district court's substantial discretion in this area, *Crockett*, 979 F.2d at 1215-16.

We agree that the district court should have stated its reasons for granting the government's motion on the record. *See Mansoori*, 304 F.3d at 651. "Some statement of the district court's reasoning is necessary for this court to be able to meaningfully review its decision," *United States v. Marion*, 590 F.3d 475, 477 (7th Cir. 2009), and the ruling we quoted from the district court's status hearing did not contain much to indicate its reasons. Accordingly, the district court erred by granting the government's motion for an anonymous jury without stating its reasons for doing so on the record.

That error is not dispositive of the matter, however, as it may be harmless in light of the complete record of this case. *See* Fed. R. Crim. P. 52(a); *Mansoori*, 304 F.3d at 651-52. Indeed, the context of the district court's statement quoted above does provide us with the information necessary to review the propriety of empaneling an anonymous jury. (Tr. 3/18/08 at 7-11.) The district court was holding a status hearing in which it considered several pre-trial motions in the Defendants' case,

including the government's motion to empanel an anonymous jury. The government and defense counsel were arguing the merits of the jury's anonymity, referring to written materials they submitted to the district court and to the proceedings and reasoning in the *Benabe* trial. The district court indicated its familiarity with the materials and arguments already submitted in the case, as well as the arguments before and decision by Judge Castillo in *Benabe*. The district court then correctly noted that "[t}he issue obviously is there is a certain prejudicial implication which has been raised and it was rejected by Judge Castillo on the basis that he believed that appropriate jury instructions could solve that." (Tr. 3/18/08 at 8.)

In response to defense counsel's arguments regarding the inherent prejudice of an anonymous jury, the government indicated that in the *Benabe* trial the jury did not manifest prejudicial fear of the defendants because "they thought that their names were being withheld to keep them safe from the press as opposed to anybody else." (Tr. 3/18/08 at 10.) The government also noted that its multiple filings regarding the danger posed by the Deuces showed that concerns of danger applied to the Defendants just as readily as their accused co-conspirators in the *Benabe* trial. The government concluded that any potential prejudice could be mitigated by the court's handling of the jury panel. It was to these arguments, and to the latter statements in particular, that the district court responded, "I believe

that is correct," before ordering an anonymous jury. (Tr. 3/18/08 at 11.)

Reviewing these arguments, the government's written motion, and the entire record of the case, we conclude that the district court's error in failing to articulate its reasons for empaneling an anonymous jury was harmless. *See Mansoori*, 304 F.3d at 651-52 (finding an erroneous anonymous jury empanelment harmless in a close case). The Defendants argue that the anonymity was harmful because it was not justified by the records and because it deprived them of a fair trial in two ways: it affected their ability to use peremptory challenges and it created an undue presumption that the defendants were danger-ous. We find the Defendants' arguments unconvincing in light of the circumstances of their case.

We acknowledge that jury anonymity is warranted only where strong reasons lead the court to believe that the jury needs protection. *See Crockett*, 979 F.2d at 1215-16. In its motion, the materials referenced therein, and its arguments at the status hearing, the government fully articulated its view of the reasons below, discussing in detail the multiple factors that the Defendants advocate on appeal. *See Mansoori*, 304 F.3d at 650-51. As the indictments indicated, there was good reason to believe that the Defendants were involved in organized, violent crime. Several of the Aurora Deuces remained unindicted, and at least one indictee was still a fugitive at the time of trial, raising the clear inference that the gang remained capable of carrying on its violent activities

despite the incarceration of the Defendants. The government indicated that it would present evidence, as it did in the *Benabe* trial, that the Deuces conspired and attempted to kill two of the gang's members the Deuces suspected of cooperating with law enforcement. The government also planned to present evidence that the Deuces attempted to murder Rivera in 2003 in retaliation for his known cooperation. Clearly there were substantiated allegations that the Defendants had acted with violence to interfere with the judicial process; it is not unreasonable, given the gang's history and capacities, to infer that it might use violence again to influence or harass the jury. The Defendants uniformly faced profound sentences, each having the potential of a life sentence, except for Handley's twenty-year potential. While long sentences are not uncommon in narcotics cases, life sentences clearly are among the most severe that can be imposed. The arrests of the Aurora Deuces—and the trial of seven of them in the *Benabe* trial—garnered news media and internet coverage. The district court had these arguments and supporting case law before it when considering the government's motion.

On appeal, the Defendants do not convincingly undermine the validity of these points. They argue that the government did not mention any situations where any Deuce had attempted to interfere with jurors and that there was no evidence that juror intimidation was likely. They do not, however, address the allegation that Deuces attempted to murder Rivera after several of them were arrested and learned that he was a cooperating

witness. Nor do they acknowledge the resulting, reasonable inference that jurors may be as susceptible as cooperators and witnesses to their gang's violent acts. *See United States v. Edmond*, 52 F.3d 1080, 1092 (D.C. Cir. 1995) (per curiam) ("[A] general willingness to obstruct justice on the part of a defendant or his associates[ ] is more than adequate to suggest a real possibility that a defendant will threaten or otherwise tamper with jurors."). While the ability and incentive to threaten jurors alone are not enough to warrant an anonymous jury, *Mansoori*, 304 F.3d at 651, we conclude that an evidenced history of interference with the administration of justice—added to the gang's ability and incentive—would bring a case within the district court's discretion to empanel an anonymous jury, *see Crockett*, 979 F.2d at 1216; *Edmond*, 52 F.3d at 1091-92; *United States v. Vario*, 943 F.2d 236, 241 (2d Cir. 1991). The anonymous jury jurisprudence of this and other circuits does not require proof of impending harm to jurors; rather, it only requires reason to believe that jury protection is necessary. *See, e.g.*, *Mansoori*, 304 F.3d at 651 (evidence of accused's unusually profound pattern of violence could cause jurors to fear for their safety); *United States v. DiDomenico*, 78 F.3d 294, 301-02 (7th Cir. 1996) (protection through anonymity appropriate to prevent tampering by organized criminals with history of bribery); *Edmond*, 52 F.3d at 1091 (history of jury tampering sufficient, but not necessary, to ascertain a threat to jurors from the charges in the indictment).

We also note that the district court did not stop with a decision to empanel an anonymous jury; rather, it

took efforts to mitigate any potential prejudice arising from the jurors' anonymity. Unlike in *Mansoori*, *see* 304 F.3d at 652, here the district court instructed the jury venire that their names were being withheld to prevent out-of-court contact, not out of concern for juror safety: "[T]he reason why we are selecting the jury in this particular way without disclosing names or specific addresses is because we have an ironclad rule that no participant can contact a juror for any reason and the jurors are not to contact any participant. So in order to make sure that no one contacts you we are not having your name disclosed." (Tr. 10/06/08 at 218.) In its pre-trial hearing, the district court agreed with the government that this kind of admonition helped limit any prejudicial impact of anonymity. *See Crockett*, 979 F.2d at 1216-17.

The district court also engaged in a thorough voir dire of the venire, a procedure we have held may adequately protect the fundamental right to an impartial jury. *Id.* at 1217; *Mansoori*, 304 F.3d at 652. The district court questioned the panel members at length, and the members did provide general information about their professions and residence neighborhoods. At the beginning and close of trial, the district court also reminded the empaneled jurors of the presumption of innocence, in part to dispel any prejudice that anonymity might have engendered. *See Mansoori*, 304 F.3d at 652. The Defendants argue that the juror anonymity prevented their effective use of peremptory challenges, but they neither argue that the voir dire or instructions were inadequate nor

address the effectiveness of the district court's mitigating efforts.

In summary, we find that the district court erred by ordering the use of an anonymous jury without articulating its reasons for doing so. Nevertheless, Judge Leinenweber's decision was well informed by argumentation and briefing, as well as by Judge Castillo's thorough treatment of the issue in—and his experiences during—the antecedent *Benabe* trial. The record demonstrates that the circumstances of this case fulfill each of the factors we have identified as informing the anonymity decision. Further, the district court undertook several measures to mitigate any potential prejudice arising from the jurors' anonymity. As "we can discern no concrete way in which the anonymous jury deprived the [D]efendants of a fair trial," *id.*, we conclude that the district court's error was harmless.

### 2. *Denial of Severance Motions*

The district court initially severed the Defendants from their alleged co-conspirators in the *Benabe* trial, reducing the number of defendants in each case from fourteen to seven. This initial severance was a Solomonic compromise between the numerous and mutually exclusive severance proposals advanced by various defendants. Naturally, it was neither a perfect solution nor a pleasing one for the Defendants who sought individual trials. After a mistrial was declared as to Crowder due to a hung jury in the *Benabe* trial, the district court granted the govern-

ment's motion to add him as a defendant in this case. Following this addition, and again after some defense counsels' opening statements, and then throughout trial, several of the Defendants renewed their severance motions; the district court denied each motion in turn.[2] On appeal, Handley, Lechuga, Rodriguez, and Crowder argue that the erroneous denials of their individual severance motions unduly prejudiced them. They request new trials where they would each be tried individually.

The Defendants do not challenge the propriety of the initial joinder of each Aurora Deuce indicted in 2006 in a single trial. *See* Fed. R. Crim. P. 8(b). Rather, they contend that the joinder of so many defendants—fourteen at the outset and even eight in their resulting trial—was inherently prejudicial and warranted discretionary relief from the district court. The Federal Rules of Criminal Procedure allow a district court to separate de-

---

[2] There is some dispute over whether the Defendants renewed their severance motions at the end of the evidence, as required by case law to avoid waiver. *See United States v. Alviar*, 573 F.3d 526, 538 (7th Cir. 2009). We assume for our analysis that the motions were all renewed, based on the district court's statement in response to a defense counsel's inquiry: "I assume that at the conclusion of all the evidence all motions have been re-raised by the defendants, and for the reasons stated earlier, they are all denied." (Tr. 11/20/2008 at 4188.) The severance issue was therefore not waived by any of the four Defendants arguing it as a ground for reversal.

fendants or counts in light of possible prejudice: "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). As the permissive language of the rule indicates, the decision whether to grant a defendant's severance motion under Rule 14 is discretionary, and we review the district court's denial of such a motion for an abuse of discretion. *United States v. Alviar*, 573 F.3d 526, 539 (7th Cir. 2009). We will reverse the conviction on severance grounds only if actual prejudice resulted from the denial of the severance motion, *United States v. Lopez*, 6 F.3d 1281, 1285 (7th Cir. 1993), and such prejudice requires that the defendant have been deprived of a fair trial, not merely a better chance at acquittal than an individual trial may have afforded, *United States v. McAnderson*, 914 F.2d 934, 948 (7th Cir. 1990).

When alleged co-conspirators are indicted together, as they were here, there is a strong preference that they be tried together. *Zafiro v. United States*, 506 U.S. 534, 537-38 (1993); *Alivar*, 573 F.3d at 539. Considerations of judicial economy, consistency of verdicts, and systematic efficiency inform this preference, *Zafiro*, 506 U.S. at 539, as "[o]ur system of criminal justice would crumple beneath the weight of individual trials if every defendant who demanded severance was provided one," *McAnderson*, 914 F.2d at 949. But we acknowledge that defendants may

face some prejudicial spillover in large complex cases, and we therefore expect district courts to balance the risk to defendants who move for severance against the benefits gained by joint trials. *Id.* District courts should continue to evaluate the risk of undue prejudice resulting from joint trials throughout the proceedings. *United States v. Harris*, 761 F.2d 394, 400 (7th Cir. 1985). In the end, however, "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro*, 506 U.S. at 538-39. Alternative mitigative measures, including limiting instructions, may suffice to offset prejudice where severance would be too drastic of a remedy. *Id.* at 539.

On appeal, four of the Defendants allege undue prejudice, in that the joint trial raised the likelihood that they were convicted based on mere association with their co-defendants rather than on their own culpability. In general, the four argue that the logic behind Judge Castillo's initial severance of the fourteen-defendant trial into two separate trials applied with equal force to their resulting eight-defendant grouping. The trial lasted longer than two months, the indictment covered a period of three years, and the acts of exceedingly violent men were discussed at length. Specifically, the four contend that the district court abused its discretion in denying their severance motions despite the risk of evidence pertaining only to other defendants spilling over to them in the eyes of the jury—a risk that is heightened in large multi-defendant trials. *See Zafiro*, 506

U.S. at 539. We will consider each of their arguments independently, mindful that "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* Our touchstone is the jury's capacity to follow its instructions and consider the evidence as to each defendant independently. *United States v. Hedman*, 630 F.2d 1184, 1200 (7th Cir. 1980).

Handley sought an individual trial (or a narrow grouping with Lechuga and Rodriguez) because he (and the other two) were not accused of any murder or attempted murder. He argues that the district court acknowledged the possibility of prejudice but denied his severance motion in deference to judicial economy—despite the fact that no economy was actually realized through the joint trial. He further contends, without reference to any precedent, that it is obviously prejudicial to subject a defendant to a trial almost two months longer than an independent trial would have been. He touts his minimal involvement in the gang, as signified by a general lack of testimony about him particularly, the lack of drug charges against him, and the standing punishment order against him for his poor participation in the gang's activities. He concludes that he was highly prejudiced by spillover evidence, given the great disparity of the evidence against him compared to that against his co-defendants.

We have repeatedly rejected similar arguments, noting that where the evidence against the appellant sufficed to convict him of the charges against him specifically, jury instructions and other mitigative measures sufficed to limit prejudicial spillover and rendered the severance denial proper. *See, e.g.*, *Alviar*, 573 F.3d at 539 ("[T]he fact that the government has greater evidence against one co-defendant does not automatically give the other defendant grounds for severance."); *United States v. Serpico*, 320 F.3d 691, 696 (7th Cir. 2003); *McAnderson*, 914 F.2d at 949; *Hedman*, 630 F.2d at 1200. Here, Handley stood charged only with racketeering conspiracy, and he denied only his participation in the conspiracy while conceding his knowledge of its existence. Recordings and testimony at trial implicated him directly in the conspiracy; although this evidence might have been susceptible to multiple interpretations, it was sufficient to sustain Handley's conviction. *See United States v. Caliendo*, 910 F.2d 429, 438 (7th Cir. 1990); *United States v. Hall*, 212 F.3d 1016, 1023 (7th Cir. 2000) ("Merely ceasing participation in the conspiracy, even for extended periods, is not enough." (*quoting United States v. Bafia*, 949 F.2d 1465, 1477 (7th Cir. 1991)). Further, his claim that he would not have been convicted in the absence of evidence admitted in the trial that would have been irrelevant and inadmissible in a separate trial is undermined by the jury's inability to reach a verdict regarding his co-defendant Perez. Like Handley, Perez was not charged with the murder and narcotics conspiracies, and the jury demonstrated its capacity to act on its

limiting evidentiary and deliberation instructions by giving individual consideration to the defendants and the evidence against them. *See Alviar*, 573 F.3d at 539 ("There was no actual prejudice to [the defendant] on account of 'spillover' evidence because the jury distinguished between him and his co-defendants.").

The bottom line is that Handley's simple disparity-in-the-evidence argument does not render the district court's disposition of his severance motion erroneous. The evidence presented against him was sufficient to support his conviction,[3] the more robust evidence against his co-defendants notwithstanding. And the insufficiency of his disparity argument applies to both the quantity of the evidence against his co-defendants as well as its nature (describing violent acts). The jury was instructed to consider each defendant's case independently, and we assume that it heeded those instructions even though Handley argues that he was the smallest player in this drama. *See McAnderson*, 914 F.2d at 949. Indeed, the record strongly suggests that the jury did follow its instructions, given the individualized verdicts it returned.

Lechuga also argues that the denial of his severance motion exposed him to undue prejudice. Like Handley,

---

[3] Handley does not separately develop an argument, in either the joint brief or his own independent brief, that the evidence was insufficient to convict him of racketeering conspiracy. His arguments are confined to the alleged severance error, and we confine our analysis accordingly.

he argues that he was not indicted on any acts of violence and that the evidence of his co-defendants' acts of murder and assault tainted his case. He also contends, however, that he had withdrawn from the conspiracy in the mid-1990s. He therefore argues that, by refusing to sever him from the Defendants' trial, the district court prejudiced the jury against him in three ways. First, the evidence of his co-defendants' violent acts could not have been introduced against him in a separate trial, where he would have stipulated to many of the facts the government sought to prove in this trial. Second, he claims that there would have been no reason to empanel an anonymous jury in a separate case because he was not accused of violent acts. Third, a post-arrest statement from his co-defendant Morales, stating that Morales and other Senior Deuces were rolled back to Junior status, was inconsistent with his theory of defense and would not have been admissible in a separate trial against him.

Lechuga's defense—unique among the Defendants— does not change the outcome of our severance analysis. The acts of violence forming the backbone of the gang's racketeering activities would have been admissible against Lechuga in a separate trial, even if he were not accused of perpetrating those acts himself. Further, he cites no authority suggesting that his withdrawal defense would preclude the introduction of this competent evidence, *see Zafiro*, 506 U.S. at 540 ("[A] fair trial does not include the right to exclude relevant and competent evidence."), and even his alleged willingness to

stipulate would not necessarily bar the government from proving its case as it chose, *see United States v. Phillippi*, 442 F.3d 1061, 1064 (7th Cir. 2006); *United States v. Conner*, 583 F.3d 1011, 1022 (7th Cir. 2009). Further, Lechuga's withdrawal defense was quite uncertain; his recorded statements, far from showing an affirmative act to withdraw, indicated that he was willing to participate in the Deuces' activities during his purported withdrawal: "I've told some of you in the room before that, hey, if there's somethin' I can do . . . I'll help you out." While he claims to have been inactive for some time, "[h]is not taking actions in furtherance of the conspiracy is not the same as taking affirmative action to withdraw." *United States v. Wren*, 363 F.3d 654, 665 (7th Cir. 2004), *vacated on* Booker *grounds sub nom. Yarbor v. United States*, 543 U.S. 1101 (2005); *see also Hall*, 212 F.3d at 1024. Accordingly, his planned withdrawal defense did not distinguish his case from Handley's, so Lechuga cannot show prejudice requiring severance as a result of the evidence of his co-conspirators' violence. *See United States v. Handlin*, 366 F.3d 584, 591 (7th Cir. 2004).

Lechuga's second argument is likewise without merit. The violent tendencies of the individual on trial are not the sole determinant for jury anonymity. *See Mansoori*, 304 F.3d at 650-51. While Lechuga himself was not accused of any discrete acts of violence in the indictment, he tacitly admits that the organization engaged in violence, referring to "numerous senseless acts of violence committed by other younger, active members of the Insane

Deuces" and describing his co-defendants as "those who terrorized the streets of Aurora." As discussed above, some of the Aurora Deuces remained on the street, and one of the gang's purposes was to protect its members after they are arrested and if they are incarcerated. The sufficient reasons for empaneling an anonymous jury in this case may have applied, even if not as strongly, in an independent trial for Lechuga or for any smaller subset of the Defendants.

The admission of Morales's statement—that he and other Senior Deuces had been rolled back to Junior status—also did not require severance at Lechuga's request. To succeed on this point, Lechuga must "rebut the dual presumptions that a jury will (1) capably sort through the evidence and (2) follow instructions from the court to consider each defendant separately." *Lopez*, 6 F.3d at 1286. His only argument was that the statement was inconsistent with his withdrawal defense and was therefore prejudicial. But neither Morales's statement nor the testimony introducing it mentioned Lechuga by name, and recordings of Lechuga's own words demonstrated his reinvolvement in the gang's activities in 2002. Even if Lechuga's withdrawal defense had some merit, any minimal prejudice arising from the introduction of Morales's statement was adequately tempered by the district court's repeated instruction that Morales's statement was to be considered only against Morales. *See United States v. Marshall*, 75 F.3d 1097, 1105 (7th Cir. 1996).

We next consider Rodriguez's allegation of substantial prejudice from the severance denial. He proposed three separate trial groupings of the indictees before ultimately seeking an independent bench trial of his own. Like Handley and Lechuga, he argues that the evidence against his co-defendants prejudiced him and that an anonymous jury would not have been necessary in his various proposed separate trials. As these arguments are indistinguishable from his co-defendants', we reject them based on our earlier analysis. Rodriguez's only new argument is that, five times during the trial, witnesses and government counsel referred to him (Miguel Rodriguez) as Miguel Martinez.[4] Rodriguez argues that these misstatements prejudiced the jury against him because the jurors could have confused his culpability with Martinez's greater culpability.

We can see neither how an individual trial would have prevented such unintentional misstatements nor how the jury could have confused Rodriguez with a fugitive who was not before the court. Of the five misstatements, one was immediately corrected by the witness, another was promptly corrected on counsel's objection, and the remaining three were not brought to the court's attention. There is no indication that these understandable and fleeting misnomers were intentional or related to the

---

[4] Martinez was another Insane Deuce charged in the same 2006 indictment as Rodriguez. He was not at trial because he remained at large during the proceedings.

presence of the several Defendants in the trial. Further, Martinez was charged with nine murders or attempted murders while Rodriguez was charged with no violent acts, and Martinez was not tried in the same proceeding. Despite Rodriguez's assertion to the contrary, the jury did not have an "impossible" or "insurmountable" task in distinguishing Rodriguez from Martinez during its deliberations. Accordingly, the district court did not abuse its discretion by denying Rodriguez's severance motions.

Crowder is the last appellant alleging actual prejudice from the district court's denial of his severance motion. He was grouped with the Defendants after the jury was unable to reach a verdict on the charges against him in the preceding *Benabe* trial. He argues that he was not an official Insane Deuce, while "each defendant in the second trial was an Insane Deuce gang member whose responsibility was to engage in all gang activities including selling drugs and shooting rival gang members."[5] (Appellants' Joint Br. at 56.) According to Crowder, his inclusion with the Defendants subjected the jury to evi-

---

[5] We pause to note that the Defendants repeatedly intonate that they were merely gang members and that membership cannot constitute a crime—such as racketeering conspiracy—without more. Interestingly, all of the Defendants joined in this brief without excepting any portion of it, and the quoted admission carries rather persuasive force that membership in the Aurora Deuces was, in fact, membership in a racketeering enterprise.

dence of his myriad violent acts that were extraneous to the Insane Deuces' activities and to evidence of his co-defendants' acts that did not involve him. This evidentiary overlap, he concludes, left the jury unable to distinguish between his non-gang-related violent acts and his participation in the racketeering conspiracy. As his counsel summarized during oral argument, Crowder was "one of the most violent individuals in this case. . . . [T]he absence of violence of his co-defendants made him appear much more heinous and increased the likelihood that the jury would take that into consideration and not appropriately examine his intent or agreement to join the conspiracy."

Crowder's argument, despite being creative, is unconvincing. While he might not have formally been an Insane Deuce, the relevant question was whether he had joined the racketeering conspiracy. The government's theory was that the shootings Crowder committed were intended to benefit the Deuces, were part of the racketeering conspiracy, and were examples of Crowder merely mistaking the victims for Latin Kings. Crowder's argument that these were unrelated acts calls into question the weight of the evidence presented by the government, not its admissibility or prejudicial impact. It was the province of the jury to determine whether the evidence against Crowder indicated that he was acting as a member of the racketeering conspiracy. Further, others among the Defendants stood accused of violence in their own actions, including a plot to kill an Aurora Deuce suspected of cooperating with authorities and

two murders in retaliation against Latin Kings. Even if we were inclined to hold that a violent actor could be prejudiced by juxtaposition with his (comparatively) benign co-conspirators in a joint trial, Crowder's circumstances simply do not fit that mold. Accordingly, the district court did not abuse its discretion in denying Crowder's motion to sever.

### 3. Juror Misconduct Allegations

After the jury returned its verdicts on the Defendants (and reported that it could not reach a verdict as to Perez), the district court received a note from one of the jurors. Juror 107 alleged that, for about three weeks during the government's case-in-chief, some of the jurors had violated the district court's instruction not to discuss the case among themselves prior to deliberations: "I spoke to some of the loud & boisterous jurors . . . about making remarks about witnesses, attorney's [*sic*] and discussing the case. . . . Jokes and other inferences about the case were made." The Defendants moved for an immediate mistrial, and the district court denied the motion, recommending that defense counsel file a written motion and that the district court would then decide whether a hearing would be necessary. After considering written submissions from the government and defense counsel, and the Defendants' accompanying motion for a new trial based on jury misconduct, the district court declined to hold a hearing and denied the Defendants' motion. The district court reasoned that there was no

allegation of external influence on the jury and that no circumstance in the case justified departure from the general rule that post-verdict interrogation of jurors is inappropriate when only internal pressures or premature deliberations are involved.

The Defendants appeal the district court's decision to not hold a hearing, claiming that the jury's alleged premature discussions denied them a fair trial. While the Defendants acknowledge that the district court could not inquire into the jury's or a juror's thought process, *see* Fed. R. Evid. 606(b), they argue that a hearing to discover whether premature deliberations occurred and, if so, the extent of those deliberations would not invade any territory protected by Rule 606. *See United States v. Resko*, 3 F.3d 684, 692 (3d Cir. 1993) ("Although the district court expressed concern that if it engaged in any colloquy with the jurors it might invade their deliberative process, the court could have easily tailored a colloquy to elicit information about the jurors' impartiality without so intruding."). We review a district court's handling of allegations of premature deliberations and juror bias for an abuse of discretion. *United States v. Moore*, 641 F.3d 812, 830 (7th Cir. 2011); *United States v. Vasquez-Ruiz*, 502 F.3d 700, 704 (7th Cir. 2007).

The Defendants compare their case to two federal cases, suggesting they compel a reversal here. First, they liken their case to *Oswald v. Bertrand*, a habeas corpus case in which we held that the trial court's failure to investigate pervasive allegations of bias among venire-

persons was erroneous. 374 F.3d 475, 483-84 (7th Cir. 2004).
The Defendants argue that the trial court's refusal to
inquire further of one panel member and others in
*Oswald* parallels the district court's refusal to question
jurors in their case. Second, they liken their case to *Resko*,
in which the Third Circuit reversed the appellant's con-
viction because the district court did not investigate
the nature and extent of jurors' pre-verdict discussions
of the case. *Resko*, 3 F.3d at 686. There, a juror alerted a
court officer on the seventh day of a nine-day trial
that members of the jury had been discussing the case.
*Id.* The reviewing court noted six (somewhat overlap-
ping) policies behind prohibiting premature delibera-
tions in criminal cases, including both potential bias
toward the prosecution due to the presentation of the
government's case first and also the risk of jurors
crediting one side's evidence over the other due to the
natural human tendency to remain committed to a view
already expressed to others. *Id.* at 689-90. The district
court addressed the jury as a whole and distributed
questionnaires meant to gauge whether each juror had
discussed the case and whether each had formed an
opinion as to guilt or innocence of either defendant. *Id.*
at 688. The Third Circuit ultimately determined that,
"given the discovery that the jurors had all engaged in
premature discussions of the case, . . . this method
was inadequate to enable the [district] court to fulfill its
responsibility of providing an appropriate cautionary
instruction and of determining whether prejudice
resulted from the jury misconduct." *Id.* at 691. The Defen-

dants argue that the district court's failure to voir dire jurors in this case after receiving the note compels a new trial, just as circumstances in *Oswald* and *Resko* did.

We disagree. The Defendants overlook two fundamental distinctions between their case and those they cite. First, the misconduct allegation here arose *after* the general verdicts had been returned, whereas every case they cited dealt with pre-verdict allegations and concomitant opportunities to investigate the circumstances before the juries retired to deliberate. Second, the majority of their cited cases involved far clearer indications of juror bias than were present here, where any potential bias is a matter of sheer speculation.

As a preliminary matter, the government and the Defendants agree that Juror 107's note neither alleged nor implied any external influence on the jury's deliberations. Accordingly, no presumption of prejudice arises, *see Remmer v. United States*, 347 U.S. 227, 229 (1954) (external communication, contact, or tampering with the jury rebutably presumed to be prejudicial to the defendants), and no hearing or investigation in which jurors are questioned was absolutely required, *see United States v. McClinton*, 135 F.3d 1178, 1186 (7th Cir. 1998) ("If outside contacts may have affected the jury, due process requires some form of hearing."). We evaluate this case as a matter of alleged intra-jury influence or misconduct. *See Vasquez-Ruiz*, 502 F.3d at 705 (distinguishing the scope of inquiry necessary based on lack of clarity whether source of message was external or internal to the jury);

*United States v. Kimberlin*, 805 F.2d 210, 243-44 (7th Cir. 1986) (no per se abuse of discretion found in district court's decision not to conduct a hearing where only intra-jury communications were alleged).

The allegations of intra-jury misconduct in this case arose only after the jury returned its general verdicts as to each of the Defendants. The Supreme Court has warned against pervasive post-verdict inquiries into juror misconduct:

> There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it. . . . [F]ull and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct.

*Tanner v. United States*, 483 U.S. 107, 120-21 (1987). Federal Rule of Evidence 606(b) flatly prevents many inquiries of jurors intended to impeach the jury's verdict.[6] The

---

[6] "Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or

(continued...)

Defendants acknowledge that none of the three areas of permissible testimony specified by the rule apply in their case, but they cite *Kimberlin* for the proposition that the district court nevertheless could have asked jurors about the alleged premature deliberations without violating Rule 606(b). *See Kimberlin*, 805 F.2d at 243-44 ("We recognize that these communications between jurors were allegedly made during the course of trial. Hence, they are not literally included in the prohibition of Rule 606(b) against testimony by a juror as to a statement during the course of the jury's deliberations.").[7]

---

[6] (...continued)

emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form. A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying." Fed. R. Evid. 606(b).

[7] In their reply brief, the Defendants misrepresent what *Kimberlin* held in their "quotation" of the case: " '[Premature deliberations] are not included in the prohibition of Rule 606(b).' *United States v. Kimberlin*, 805 F.2d 210, 243 (7th Cir. 1986)." (Joint Reply Br. at 20.) We use scare quotes because their substitution was misleading and because even without

(continued...)

The Defendants may be correct that the district court *could* have inquired about whether the discussions occurred and whether they constituted premature deliberations. But they ignore the remainder of Rule 606(b) and our holding in *Kimberlin* when they state that "the issue was whether there were premature discussions of the evidence *and then* whether those discussions prejudiced the defendants." (Appellants' Joint Br. at 64 (emphasis added).) Any inquiry as to bias arising from the alleged premature deliberations would run afoul of the Rule's clear proscription: after the verdict is entered, "a juror may not testify as to . . . the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . . or concerning the juror's mental processes in connection therewith. " Fed. R. Evid. 606(b). As we held in *Kimberlin*, any "hearing would be fruitless unless these statements, if made, would be presumed to be prejudicial." 805 F.2d at 244. For reasons we discuss below, we decline to presume prejudice under the circumstances of this case.

Our determination comports with the holdings of this and other courts to have considered district courts' obligations when allegations of jury misconduct arise after

---

[7] (...continued)
the substitution it is not an accurate quotation, having omitted a critical word. We advise counsel to observe their obligation of candor to this court.

the verdicts have been entered. In *United States v. Stafford* we determined that a post-verdict motion for a hearing regarding jury bias was too late, "as the defendants would have been seeking testimony from a juror designed to impeach the jury's verdict without any basis for supposing that the jury had been subjected to outside influences." 136 F.3d 1109, 1113 (7th Cir. 1998). In a Sixth Circuit appeal with allegations of premature deliberations, the court noted that "if the case involves an internal influence, [Rule 606(b)] does not permit the post-verdict interrogation of jurors." *United States v. Logan*, 250 F.3d 350, 380 (6th Cir. 2001). *See also United States v. Caldwell*, 83 F.3d 954, 956 (8th Cir. 1996) ("[Rule] 606(b) generally precludes the testimony of any juror regarding intrajury communications, as well as the testimony of a nonjuror regarding an intrajury statement."). Tellingly, the Defendants cite no case demonstrating the necessity of ordering the hearing they seek here based on intra-jury misconduct that comes to light after the verdict has issued.

We also consider that Juror 107's note only suggested the possibility of premature deliberations (as opposed to jokes, idle comments, or other generalized discussions), and it contained no suggestion that the jurors were in any way biased. By prohibiting premature deliberations, we seek to protect a defendant's right to a fair trial by

assuring jury impartiality,[8] and that is the ultimate inquiry of our analysis here. *McClinton*, 135 F.3d at 1186. "The standard of impartiality is whether a juror can set aside an impression or opinion and decide a case solely on the evidence presented in court." *Id.* at 1188. The intra-jury discussions of the case certainly violated the district court's order, but that does not necessarily mean that the jury's objectivity was compromised. *See Resko*, 3 F.3d at 690 ("[W]hen there are premature deliberations among jurors with no allegations of external influence on the jury, the proper *process* for jury decisionmaking has been violated, but there is no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial." (emphasis added)).

As we held in *Oswald*, the adequacy of the judge's actions in the face of allegations of misconduct "is a function of the probability of bias; the greater that probability, the more searching the inquiry needed to make reasonably sure that an unbiased jury is impaneled." 374

---

[8] We note that fair trials and "premature deliberations" are not always mutually exclusive. Some state court systems explicitly allow private discussions of the case among jurors during breaks in the trial, at least if the jurors are reminded to reserve judgment until the actual deliberations begin. *See, e.g.*, Ind. Jury R. 20(a)(8); Ariz. R. Civ. P. 39(f). *See generally* Shari Seidman Diamond et al., *Juror Discussions During Civil Trials: Studying and Arizona Innovation*, 45 Ariz. L. Rev. 1 (2003) (describing empirical research regarding the impact of rules allowing jurors to discuss the trial as it progresses).

F.3d at 480. This is not a case like *Oswald* where "the circumstances strongly suggested that the [venire] had made up its mind that Oswald was guilty" before the jury was even selected. *Id.* at 479. Rather, the "note in itself could hardly be considered conclusive evidence of prejudice." *Stafford*, 136 F.3d at 1112. And when the district court considered these allegations, it had before it the jury's general verdicts that ran the gamut from guilty through hung to not guilty. These split verdicts imply that the jury reached independent conclusions as to each defendant without making up its mind before the close of the evidence. *See United States v. Cuthel*, 903 F.2d 1381, 1383 (11th Cir. 1990). In light of both the differential verdicts and the vagueness of the note—either of which might suffice to belay the need for a hearing in a given case—the allegation of jury misconduct in this case was not sufficiently substantial to warrant questioning the jurors about the content of the discussions. *See Stafford*, 136 F.3d at 1112-13 ("Not every allegation of jury misconduct is sufficiently substantial . . . to warrant putting the jurors on the spot."); *Logan*, 250 F.3d at 378-79 ("[T]rial judges are afforded considerable discretion in determining the amount of inquiry necessary, if any, in response to allegations of jury misconduct."). Because Rule 606(b) prohibits the very inquiry the Defendants requested, and because there was no clear indication of juror prejudice in the circumstances of their case, we cannot conclude that the district court abused its discretion in declining to hold an evidentiary hearing after it received Juror 107's note.

In summary, the district court erred when it empaneled
an anonymous jury without specifying its reasons for
doing so, but that error was harmless because the cir-
cumstances clearly allowed for the use of an anonymous
jury. The district court did not abuse its discretion when
it denied the Defendants' myriad severance motions.
Likewise, it was not an abuse of discretion to deny
their request for a hearing based on alleged juror mis-
conduct. Accordingly, none of the issues jointly pre-
sented by the Defendants lead us to conclude that new
trials are warranted. As Barbosa brings no other issues
on appeal, we will affirm his conviction. We next con-
sider the other Defendants' independent issues.

### B.  Morales's Separate Claim

Morales challenges his conviction,[9] arguing that the
district court's admission of statements about his criminal
history during the trial phase was erroneous because
he did not testify as Federal Rule of Evidence 609(a)(1)
requires for the admission of such evidence. We review
the district court's evidentiary decision for an abuse of
discretion, disturbing the ruling only if no reasonable
person could agree with it. *United States v. Dinga*, 609
F.3d 904, 908 (7th Cir. 2010). Even if we find the ruling to

---

[9] Although his brief does not specify which of his two con-
victions Morales appeals, he presents facts and arguments
pertaining only to the narcotics conspiracy charge. We there-
fore construe his challenge to pertain only to that charge.

be erroneous, we will reverse the conviction only if the evidentiary error was not harmless. Fed. R. Crim. P. 52(a); *United States v. Thornton*, 642 F.3d 599, 604, (7th Cir. 2011).

Morales did not testify during the trial, but the government introduced evidence of his own statements made to agents after his arrest: "[Morales] said he had gone in and out of the Illinois Department of Corrections for narcotics-related offenses," and "He said he went to the Illinois Department of Corrections in 1995 for delivery of cannabis." The district court overruled Morales's objection to the testimony. After the jury returned its verdicts, Morales moved for a new trial based on the admission of his criminal history. The district court denied his motion, noting both that the evidence was properly introduced to prove the Deuces' activities in the prison system and also that any erroneous admission could not justify a new trial because of the overwhelming evidence against him.

We likewise find that the challenged testimony could not have affected the verdict at issue, so we need not determine whether the admission represented an abuse of the district court's discretion. *See United States v. Simmons*, 599 F.3d 777, 780 (7th Cir. 2010). Special Agent Mark Anton testified as to statements Morales made during an interview conducted after Morales's arrest to assess his potential as a cooperating witness. Among those statements were comments—to which Morales did not object—confirming that he had been "involved in

narcotics trafficking, and some of his proceeds or profits from his narcotic trafficking would go to the Insane Deuces." (Tr. 11/13/08 at 3699.) Morales also told Special Agent Anton that he was made the Junior Enforcer on July 5, 2002, (Tr. 11/13/08 at 3702, 3704), and that "all Insane Deuce gang members that were involved in narcotics drug trafficking were expected to pay a part of the proceeds into the caja, as well as any of the Insane Deuce gang members that were high level narcotic drug dealers," (Tr. 11/13/08 at 3705). The admission of a statement that Morales had gone to jail for delivering marijuana could not have affected the jury's decision-making process when his admission to having engaged in the trafficking conduct for the Insane Deuces' benefit during the period alleged in the indictment was already before the jury without any objection. *See United States v. Courtright*, 632 F.3d 363, 370 (7th Cir. 2011). Accordingly, we will not reverse Morales's conviction.

### C. *Rodriguez's Separate Claim*s

Rodriguez presents three additional issues for our review, challenging both his conviction and his sentence. He first contends that, because the district court erred by denying his motion for a judgment of acquittal on the narcotics conspiracy charge against him, we must reverse his conviction. Rodriguez then contends that the district court erred in sentencing him by holding him accountable for his co-conspirators' actions and

by taking his previous conviction for possession of a dangerous weapon into account both in calculating his offense level and in determining his criminal history points.

### 1. Sufficiency of the Evidence for Conviction

Rodriguez moved for a directed verdict at the close of the government's evidence, arguing that "as to the drug conspiracy count, there ha[d] been no mention to Mr. Rodriguez in any way." (Tr. 11/17/08 at 3836.) Rodriguez renewed his motion after the Defendants rested, filed a motion for a new trial and judgment of acquittal after the trial ended, and then filed a supplemental motion for the same; the district court denied each. Rodriguez now appeals the denial of his motions, arguing that the government presented insufficient evidence to prove that he agreed to join the drug conspiracy. We review the district court's denial of motions for a judgment of acquittal *de novo. United States v. Jones*, 222 F.3d 349, 351 (7th Cir. 2000). In considering whether the evidence was sufficient to sustain a guilty verdict, we review it in the light most favorable to the government. *Id.* at 352. We will overturn the verdict "only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Huddleston*, 593 F.3d 596, 601 (7th Cir. 2010).

Rodriguez was convicted of conspiring to distribute and possess with the intent to distribute controlled sub-

stances in violation of 21 U.S.C. §§ 841(a)(1), 846. To
sustain the conviction, the evidence must show that
Rodriguez either implicitly or explicitly agreed with
other Deuces to distribute narcotics or possess them
with the intent to distribute them. *United States v. Vallar*,
635 F.3d 271, 286 (7th Cir. 2011). In response to
Rodriguez's motions, the government noted that Rodri-
guez participated in two Insane Deuce meetings where
the conspirators discussed the use of the caja for drug
fronting and the narcotics "free enterprise" system.
Rodriguez is correct that his awareness of the narcotics
conspiracy and his presence during conspiratorial discus-
sions do not suffice for a conspiracy conviction. *United
States v. Taylor*, 600 F.3d 863, 868 (7th Cir. 2010). But
Rodriguez was a long-term member of the gang (more
than a decade of active participation) who eventually
reached Senior status before being rolled back to Junior
status—and to its active requirements. He was well
aware of the functions and funding of the caja, he
accepted the gang's rules about drug dealing, and he was
recorded advocating the free enterprise system. Rodri-
guez's arguments that he was not a participant in the
trafficking and distribution of narcotics and that he was
merely aware of it "may have been valid arguments to
put before a jury, [but] they are not enough to support a
sufficiency of the evidence challenge on appeal." *Taylor*,
600 F.3d at 869. The government was not required to
prove that Rodriguez personally bought, sold, or pos-
sessed any narcotics in order to obtain a conviction under
21 U.S.C. § 846, only that he agreed to the activities.

*See United States v. Bolivar*, 532 F.3d 599, 603 (7th Cir. 2008); *United States v. Johnson*, 592 F.3d 749, 754 n.4 (7th Cir. 2010). The totality of the evidence regarding Rodriguez's membership in the gang, his participation in and advocacy of its activities, and his enjoyment of the caja's benefits allowed a jury to conclude that he implicitly agreed to the distribution of narcotics by fellow Insane Deuces for the gang's benefit. Although the decision is close, we find that the district court did not err in denying Rodriguez's motion for a judgment of acquittal. Accordingly, we will affirm his conviction.

### 2. *Sentencing Challenges*

Rodriguez challenges his sentence on two grounds. He first contends that the district court erred in determining his offense level by holding him accountable for his co-conspirator's violent acts and narcotics distribution activities without making sufficient findings as to the relevance of that conduct to his particular case. He then contends that the district court impermissibly "double counted" his illegal possession of a firearm by considering it while calculating his offense level and while determining his criminal history category. These procedural errors, he argues, mandate a resentencing. We review the district court's sentencing procedures, including its calculation of the offense level and determination of the defendant's criminal history category, *de novo*. *United States v. Nance*, 611 F.3d 409, 412, 415 (7th Cir. 2010). We review any factual determination upon which

the district court relied in setting the offense level, such as the amount of drugs attributable to a defendant, for clear error. *United States v. Winbush*, 580 F.3d 503, 512-13 (7th Cir. 2009).

In calculating a defendant's offense level, the district court considers not only the offenses of conviction but also any conduct relevant to the offenses. U.S.S.G. § 1B1.3(a)(1)(B). Standing alone, Rodriguez's convictions on racketeering conspiracy and narcotics conspiracy counts do not suffice to sentence him for all of his co-conspirators' actions. *See United States v. Soto-Piedra*, 525 F.3d 527, 531 (7th Cir. 2008) ("Conspiracy liability, as defined in *Pinkerton v. United States*, 328 U.S. 640, 646-48 (1946), is generally much broader than jointly under-taken criminal activity under § 1B1.3."). Rather, those actions must have been both in furtherance of the jointly undertaken criminal activity and also reasonably fore-seeable to Rodriguez. U.S.S.G. § 1B1.3(a)(1)(B)*; United States v. Salem*, 597 F.3d 877, 884-85 (7th Cir. 2010). This determination requires the district court to "make a preliminary determination of the scope of the criminal activity the defendant agreed to jointly undertake." *Salem*, 597 F.3d at 886.

Rodriguez challenges the sufficiency of the district court's findings regarding the scope of his jointly under-taken activities and the foreseeability of his co-conspira-tors' criminal activities. In reaching the offense level for his racketeering conspiracy conviction, the district court held Rodriguez liable for all of the violent acts

perpetrated by and narcotics amounts distributed or possessed by his co-conspirators. It did not, however, explicitly state the basis for its finding that the scope of Rodriguez's undertaken activities was coextensive with that of the Insane Deuce enterprise or the overall narcotics conspiracy. Nor did it explicitly state that all of the violent acts and drug quantities involved in the Defendants' case were foreseeable to Rodriguez.

During sentencing, Rodriguez never argued that his co-conspirators' acts were unforeseeable to him or outside the scope of his jointly undertaken criminal activity. He did object to being held liable for his co-conspirators' violence, but his arguments—both in his written objection and at the sentencing hearing—had nothing to do with his argument on appeal. His three arguments below pertained only to: (1) whether he could be held liable for his co-conspirators acts when the jury did not specifically find he was personally involved in any of them—a question well settled by the Sentencing Guidelines, *see* U.S.S.G. § 1B1.3, and case law, *e.g.*, *Salem*, 597 F.3d at 884-85; (2) whether he could be held responsible for acts perpetrated while he was in prison or in senior status—questions answered by the district court's findings that he had not withdrawn during those periods; and (3) an abandoned argument about the reliability of the evidence upon which conspiratorial liability may be found. Accordingly, we deem Rodriguez's arguments based on scope and foreseeability forfeited and review his arguments only for plain error. *See United States v. Bell*, 624 F.3d 803, 808 (7th Cir. 2010). We will

reverse only if there "was an obvious error that seriously affected both [Rodriguez's] substantial rights and the fairness, integrity, or public reputation of judicial proceedings." *United States v. Long*, 639 F.3d 293, 299 (7th Cir. 2011).

The district court considered and overruled Rodriguez's objections to the presentence report (PSR), and the transcript of the sentencing hearing clearly indicates that the district court relied upon the PSR in determining Rodriguez's offense level and criminal history category. After the sentencing hearing, the district court adopted the PSR in its "Statement of Reasons" form attached to its judgment. The PSR succinctly established that the scope of Rodriguez's jointly undertaken criminal activity was coincidental with that of the Insane Deuce enterprise overall. (Rodriguez PSR at 13.) It also made clear that "each and every overt act of violence in connection with the RICO conspiracy, although perhaps not specifically agreed to by each and every defendant on every specific occasion, was nonetheless reasonably foreseeable to each and every defendant given the nature of their joint RICO enterprise." *Id.* Rodriguez did not challenge either of these factors he now argues were insufficiently addressed by the district court, and we find that the district court did not plainly err by considering his co-conspirators' acts in calculating Rodriguez's racketeering conspiracy offense level. *See Long*, 639 F.3d at 300 ("Deficient findings of fact can be cured, at least for purposes of plain error review, when the district court adopts the PSR in its Statement of Reasons, the PSR

provides the necessary factual support for the sentence, and the defendant had an opportunity to object to the PSR's findings.").

Rodriguez's arguments regarding his sentence for the narcotics conspiracy are similar to those informing his objection in the district court, but we need not determine whether plain or clear error review is appropriate because the outcome is the same under either standard. The district court found that the evidence presented at trial easily proved that the narcotics conspiracy involved a quantity of drugs corresponding to an offense level of 38. But the district court made no finding that the scope of Rodriguez's agreement was coextensive with the entire narcotics conspiracy. Nor did the PSR contain such a statement, as it did with the racketeering conspiracy count. *See Salem*, 597 F.3d at 888 ("[E]ven if the court had adopted the findings in the PSRs in this case at the time of sentencing, the court's factual findings would still be deficient on a key element of the relevant conduct analysis: the scope of the jointly undertaken criminal activity."). We find that the district court erred when it found that the quantity of drugs involved in Rodriguez's narcotics conspiracy offense included all of the drugs possessed or distributed by his co-conspirators without having made the necessary findings. *See* U.S.S.G. §§ 2D1.1(a) & cmt. 12, 1B1.3(a)(2).

Nevertheless, this error is harmless. As calculated by the PSR, the adjusted offense level for Rodriguez's racketeering conspiracy conviction (41) exceeded the adjusted

offense level for his narcotics conspiracy (38). (Rodriguez PSR at 27.) His racketeering conspiracy conviction thus controlled his combined offense level. *See* U.S.S.G. § 3D1.4. As Rodriguez concedes, (Rodriguez Reply Br. at 9), any error in computing the drug quantity thus would not affect his guidelines range.

The same consideration renders Rodriguez's final sentencing argument moot. He argues that the district court erroneously double-counted his possession of a firearm in calculating his narcotics conspiracy offense level and in setting his criminal history category. Because his total offense level is based on his racketeering conspiracy offense, no possibility of double counting is presented. Accordingly, we will affirm his sentence.

### D. *Hernandez's Separate Claims*

Hernandez likewise challenges both his conviction and his sentence. He first contends that the jury's verdict, finding him guilty of conspiring to distribute narcotics, rested on insufficient evidence. He then contends that the district court erred in sentencing him to life imprisonment, alleging three infirmities with the district court's consideration of his case. Neither contention has merit.

### 1. *Sufficiency of the Evidence for Conviction*

Like his co-defendant Rodriguez, Hernandez was convicted of conspiring to distribute and possess with the

intent to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1), 846. Hernandez's arguments are even weaker than Rodriguez's, and we easily conclude that sufficient trial evidence showed that Hernandez either implicitly or explicitly agreed with other Deuces to distribute narcotics or possess them with the intent to distribute them. *Vallar*, 635 F.3d at 286. Hernandez was a long-standing gang member and participant (joining at the age of twelve and rising to Junior status), he was present in Insane Deuce meetings where drug dealing using the Nation's caja was discussed, he was recorded requesting quantities of drugs for himself and his cousin, he routinely used marijuana with other Deuces, and he was filmed during a hand-to-hand transaction in which he accepted money in exchange for a small package and placed the money in his sock. The evidence that Hernandez knew of the narcotics conspiracy was overwhelming, leaving only a question of whether he agreed to join it. *See United States v. Longstreet*, 567 F.3d 911, 918-19 (7th Cir. 2009). That no evidence conclusively proved that Hernandez personally bought, sold, or possessed any narcotics does not prevent a jury from finding him guilty of violating 21 U.S.C. § 846. *See Bolivar*, 532 F.3d at 603; *Johnson*, 592 F.3d at 754 n.4. The jury could reasonably infer from the totality of the evidence that Hernandez joined the Insane Deuces' narcotics conspiracy. Accordingly, we will affirm his conviction.

*2. Imposition of a Life Sentence*

Hernandez next contends that we must order a resentencing because the district court wrongly sentenced him to a term of life imprisonment. He first argues that the evidence presented at trial and during the sentencing hearing could not support the district court's upward adjustment of his offense levels based on his co-defendants' conduct (both their violent acts and their distribution of narcotics). His second argument focuses on the inclusion of four prior sentences in categorizing his criminal history; he argues that the sentences were based on activities relevant to the charged conspiracies and thus could not be separately counted to enhance his sentence in this case. His third argument is that the district court did not properly consider the sentencing factors in 18 U.S.C. § 3553(a) because it ignored his arguments about the factors. We find none of the arguments convincing and dispose of them quickly.

As discussed in our analysis of Rodriguez's sentence above, the district court must consider conduct relevant to the charged offense when calculating the guidelines-recommended sentence range. *See* U.S.S.G. § 1B1.3; *United States v. Quintero*, 618 F.3d 746, 755 (7th Cir. 2010). The reasonably foreseeable actions of the other Insane Deuces in the racketeering conspiracy can be attributed to Hernandez for the purposes of sentencing, *Quintero*, 618 F.3d at 755, and the district court specifically adopted Hernandez's PSR and its findings during the sentencing hearing, (Hernandez Sent. Tr. 48). The PSR, in

turn, clearly defined Hernandez's scope of jointly under-taken criminal activity to be the same as that of the Insane Deuce racketeering conspiracy overall. (Hernandez PSR at 14.) It also found that, despite Hernandez's possible ignorance of some of his co-conspirators' violent acts, each of the violent acts detailed in the report was rea-sonably foreseeable to Hernandez due to the nature of the enterprise he joined and actively participated in. *Id.*

Hernandez argues that some of those acts could neither be foreseeable nor in furtherance of the conspir-acy because they were random and involved victims who were not rival gang members. But trial testimony showed that these acts were undertaken out of mistaken beliefs regarding the victims' identities or affiliations; in that sense the shootings were neither random nor unforeseeable. Although some of the evidence presented throughout trial and sentencing may have conflicted, the district court was in the best position to determine what information was most credible. It certainly had sufficient, credible evidence before it to find by a preponderance of the evidence that Hernandez embraced the entire scope of the racketeering conspiracy's activities and foresaw the violent acts of his co-conspirators. Accord-ingly, the district court did not clearly err in finding the violent acts to be conduct relevant to Hernandez's offense under the Sentencing Guidelines.[10]

---

[10] Based on that holding, we do not reach Hernandez's argu-ment that the district court clearly erred in determining the

(continued...)

Hernandez next argues that the district court should not have counted four of his previously served sentences in its determination of his criminal history category. He asserts that the sentences were imposed for crimes that occurred during the period of the racketeering conspiracy described in the indictment and that those crimes involved conduct relevant to the conspiracy. He concludes that these prior sentences should not have been included in the court's guidelines calculations. *See* U.S.S.G. § 4A1.2 cmt. n.1; *Nance*, 611 F.3d at 412-13 ("[W]hen calculating a defendant's criminal history, a district court ordinarily cannot consider previous sentences for acts that qualify as relevant conduct.").

His argument is unavailing for two reasons. First, he does not explain how his previous convictions—for example, for aggravated battery of a school employee and domestic battery of his girlfriend—were relevant to his racketeering offense. Second, even assuming that each sentence resulted from relevant conduct, the sentences would still have been appropriately counted in the criminal history computation. The guidelines recognize

---

[10] (...continued)

drug quantities applicable to his offense level for his narcotics conspiracy conviction. The adjusted offense level for his racketeering conspiracy conviction (45) exceeded the adjusted offense level for his narcotics conspiracy (38) as calculated by the PSR. (Hernandez PSR at 28.) His racketeering conspiracy conviction thus controlled his combined offense level. *See* U.S.S.G. § 3D1.4.

that a defendant may be convicted of racketeering based in part on conduct for which he has already been convicted and sentenced. *See* U.S.S.G. § 2E1.1 cmt. n.4. In such a case, if "the previously imposed sentence resulted from a conviction prior to the last overt act of the instant offense" the previously imposed sentence is treated "as a prior sentence under § 4A1.2(a)(1) and not as part of the instant offense." *Id.* "In other words, RICO presents an exception to the general rule of § 4A1.2(a)(1)." *United States v. Garecht*, 183 F.3d 671, 677 (7th Cir. 1999). Because Hernandez was personally active in the racketeering conspiracy after the date of his most recent criminal conviction in July 2002, the district court did not err in including these four sentences in his criminal history.

In his final sentencing issue, Hernandez accuses the district court of having refused to consider all of the sentencing factors contained in 18 U.S.C. § 3553(a). His argument is meritless. After hearing Hernandez's arguments regarding the statutory factors at the sentencing hearing, the district court addressed the factors, including Hernandez's difficult childhood, the circumstances that allegedly drove him into the gang, the seriousness of the offense, and the needs for protection and deterrence. The district court also had reviewed and ultimately adopted the PSR that recounted the family and substance abuse information that Hernandez now contends the district court ignored. Hernandez essentially argues that the district court gave insufficient weight to facts that might have counseled a lower sentence, but "it is

perfectly acceptable for courts to assign varying weights to the [§ 3553(a)] factors as they deem appropriate in the context of each case." *United States v. Busara*, 551 F.3d 669, 674 (7th Cir. 2008). The district court adequately considered the statutory factors and explained its reasons for the sentence it imposed, and "[t]hat was all it had to do." *United States v. Ashqar*, 582 F.3d 819, 826-27 (7th Cir. 2009). Accordingly, we will affirm Hernandez's sentence.

### E. Lechuga's Separate Claims

Lechuga also challenges both his conviction and his sentence, alleging that his "retirement" from the Insane Deuces at age 35 effected a withdrawal from their conspiracies. He first contends that insufficient evidence was presented at trial to allow a reasonable jury to find, beyond a reasonable doubt, that he had rejoined the racketeering or the narcotics conspiracy. He then contends that, even if we affirm the convictions, we must nevertheless remand his case for resentencing because the district court erroneously found him liable for his co-conspirators' conduct and found him to be a career offender. Neither contention has merit.

### 1. Sufficiency of the Evidence for Conviction

Lechuga contends that both his racketeering and narcotics conspiracy convictions were based on insufficient evidence. He characterizes the evidence presented at trial as having proven only that he attended two Deuce

meetings in 2002 and, at most, discussed the possibility of rejoining the gang. In light of the evidence he presented regarding his previous withdrawal from the gang in or around 1996, Lechuga argues that his attendance at and his recorded statements in the two 2002 meetings could not possibly constitute evidence of his joining either of the Insane Deuces' racketeering or narcotics conspiracies. We review the sufficiency of the evidence in the light most favorable to the prosecution, and we will affirm the conviction if any rational trier of fact could have found, beyond a reasonable doubt, that Lechuga fulfilled the essential elements of the conspiracies charged. *United States v. Durham*, ___ F.3d ___, ___, 2011 WL 2535801, *5 (7th Cir. June 28, 2011).

Lechuga's argument, at base, is that the government did not prove that he had rejoined the Insane Deuces' conspiracies after his earlier withdrawal, so the jury lacked sufficient evidence on which to convict him. The government and Lechuga dispute the nomenclature of his status in the Insane Deuces before the summer of 2002; the government asserts that he was a Senior, but Lechuga insists that he was retired. Regardless of the appropriate classification, he was not heavily involved in the Deuces in the five years preceding the June 2002 roll-back meeting where Seniors were recalled to Junior status. He argues that this inactivity constituted his withdrawal from the conspiracy. Assuming without deciding that Lechuga presented sufficient evidence of his withdrawal to meet his initial burden of production, the prosecution assumed the burden of proving either that

Lechuga's withdrawal was insufficient or that he joined the conspiracy anew after the roll-back meeting. *United States v. Starnes*, 14 F.3d 1207, 1210 (7th Cir. 1994). If it failed to do so, no rational jury could have convicted Lechuga of the racketeering and narcotics conspiracies.

We easily conclude that sufficient evidence allowed the jury to conclude that Lechuga's alleged withdrawal was ineffective or that he had rejoined the Deuces' conspiracies. Even if Lechuga was "retired" and not a Senior, neither retirement from an organization nor mere inactivity constitutes effective withdrawal from a conspiracy. *United States v. Hargrove*, 508 F.3d 445, 449 (7th Cir. 2007). Effective withdrawal requires the conspirator to take an affirmative act, either confessing to authorities or clearly communicating to his co-conspirators that he disavows the conspiracy and its criminal objectives. *United States v. Emerson*, 501 F.3d 804, 811 (7th Cir. 2007). In his own words, Lechuga remained willing to help the gang in its endeavors during the period of his supposed withdrawal; he never voiced his disassociation from the gang, and he certainly did not cooperate with authorities to disrupt its criminal activities.[11]

---

[11] In his brief, Lechuga makes multiple references to having retired in 1996. (Lechuga Br. at 15-16, 18, 30.) He even alleges that he "formally declared his retirement from the gang in 1996." *Id.* at 30. But he does so without any citation to the record, and we find no evidence that he ever announced or declared his intentions to anyone.

Even if the jury found his withdrawal effective at some point preceding 2002, it could have found that he rejoined the conspiracies. Lechuga makes much of the fact that no evidence explicitly showed his involvement after the second of two meetings in 2002, but the jury could infer from his involvement in those meetings that he joined the conspiracies anew. He took an active part in the discussion of the gang's business, asking about promotions of Shorties to Juniors, inquiring about continued protection by the gang for incarcerated members, recommending the institution of receipts for drug and money transactions from the caja, and participating in discussions of planned acts of violence. He also attempted to procure a half-ounce of cocaine from the caja to resell and became agitated when he was denied despite his status in the gang. We acknowledge that the evidence, including his own statements, is susceptible to multiple interpretations. But when viewed in the light most favorable to the prosecution and the verdict, the evidence clearly sufficed for his convictions on both the racketeering and narcotics conspiracies. A rational trier of fact could—and did—find that the government disproved his withdrawal theory of defense. Because we find that the record was not "devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt," *Durham*, 2011 WL 2535801 at *5, we will affirm his convictions.

2. *Relevant Conduct and Career Offender Determinations in Sentencing*

Lechuga next contends that, even if his convictions were sound, his sentence must be vacated because the sentencing court committed two crucial errors. Like Rodriguez and Hernandez, Lechuga first argues that the district court increased his offense level based on erroneous findings that his co-conspirators' acts of violence were conduct relevant to his offense under the Sentencing Guidelines. He then argues that the district court erroneously determined that his two prior convictions for distributing narcotics made him a career offender under the Guidelines. These two errors, he concludes, resulted in a dramatic increase from the appropriate 57-71 month guideline range to the twenty years' imprisonment he ultimately received as a sentence. We review *de novo* the district court's application of the sentencing guidelines, and we review its findings of fact for clear error. *United States v. Knox*, 624 F.3d 865, 870 (7th Cir. 2010).

The jury found Lechuga guilty of both the racketeering and narcotics conspiracies, but their general verdicts shed no light on how it assessed his withdrawal defense. After the jury returned its general verdicts, it received instructions and special verdict forms to assess each guilty Defendant's involvement in the racketeering conspiracy and the amount of narcotics each guilty Defendant was responsible for in the narcotics conspiracy. Because the indictment did not accuse Lechuga of personal in-

volvement in any of the acts of violence described as part of the racketeering conspiracy, no special verdict questions were submitted regarding Lechuga's intent and specific involvement in those violent acts. The jury was asked, however, what types and amounts of narcotics had been proven as to Lechuga regarding his involvement in the narcotics conspiracy; it determined that he was accountable for less than 500 grams of powder cocaine and no cocaine base or marijuana. The district court, in interpreting the general and special verdicts, found that the jury had determined that Lechuga had withdrawn from the conspiracies at some point prior to the June 2002 roll-back meeting, but that he had rejoined the conspiracies at or before that meeting. (Lechuga Sent. Tr. at 25-26.) It then found that Lechuga was responsible for all of the incidents of violence perpetrated by his co-conspirators in the period between the June 2002 meeting and the date of his arrest, *id.*, but found that he was only responsible for the small amount of narcotics entered in the jury's special verdict form, *id.* at 39.

Lechuga challenges the district court's relevant conduct finding as to his racketeering conspiracy offense, arguing that his co-conspirators' violent acts could not have been attributable to him given the extremely limited scope and duration of his conspiracy. He reads the jury's verdicts to declare that he rejoined the conspiracies only for the month-long period between the roll-back meeting and a subsequent meeting he attended and only for the circumscribed purpose of obtaining a

small amount of powder cocaine. Given that self-serving assessment of the scope of his jointly undertaken criminal activities, the violent acts of his co-conspirators would not have been foreseeable to him and, therefore, could not constitute conduct relevant to his racketeering offense. *See, e.g.*, *United States v. Bustamante*, 493 F.3d 879, 887-88 (7th Cir. 2007) (narcotics conspirator only accountable for the conduct relevant to his smaller conspiracy despite it being a subset of a larger conspiracy of which he was aware).

Lechuga reads too much into the jury's verdicts, especially given that no special verdict was requested as to his involvement in the violent acts specified in the racketeering count and that the quantity verdict related only to the narcotics conspiracy. The verdicts are susceptible to multiple interpretations, and read in the light most favorable to the prosecution, they certainly do not prove that Lechuga again withdrew from the racketeering conspiracy after rejoining in the summer of 2002. Nor did any evidence at the trial or at sentencing demonstrate the elements of any subsequent withdrawal from the conspiracies. *See Emerson*, 501 F.3d at 811 (mere inactivity insufficient to establish withdrawal). Nothing in the verdicts or evidence shows conclusively that Lechuga's agreement regarding the racketeering enterprise and its objectives was necessarily smaller than the overall conspiratorial agreement. We conclude that the district court did not clearly err in finding that his co-conspirators' violent acts were relevant to Lechuga's racketeering offense, given his long-standing Insane Deuce affiliation,

his pervasive familiarity with their objectives and methods, and his renewed involvement in planning their activities.

Lechuga's final argument regards the district court's determination that he was a career offender under the Sentencing Guidelines. Lechuga was convicted for delivery of marijuana in 1990 and for delivery of cocaine in 1991. He argues that he was an active Insane Deuce at those times and that, under the government's theory that all narcotics sales by Deuces had to be at least in part for the gang's benefit, those deliveries were pursuant to his participation in the gang. He concludes that those two previous convictions could not be used to categorize him as a career offender during sentencing for his current racketeering and narcotics conspiracy convictions.

In general, a defendant is sentenced as a career offender upon conviction of his third violent or drug-related felony. U.S.S.G. § 4B1.1; *Garecht,* 183 F.3d at 673. If the career offender guideline applies, the defendant is automatically categorized in criminal history Category VI, and his total offense level may shift. U.S.S.G. § 4B1.1(b). The Guidelines require that the two prior felony convictions pre-date the instant offense of conviction and that the sentences for those two prior convictions be counted separately under section 4A1.1, the criminal history category guideline. U.S.S.G. § 4B1.2(c). The definition of "prior sentence" as the term is used in section 4A1.1 plays a critical role in Lechuga's appeal because it means

"any sentence previously imposed . . . for conduct *not part of the instant offense*." U.S.S.G. § 4A1.2(a)(1) (emphasis added). We therefore return to section 1B1.3 to determine whether the conduct underlying the prior sentences is conduct relevant to the instant offense. According to Lechuga, his prior sentences resulted from drug-dealing activities that were intrinsic parts of his current offenses of racketeering and narcotics conspiracies, so the district court could not consider the previous convictions in determining his career offender status.

The district court rejected Lechuga's argument and determined that he was a career offender based on the narcotics conspiracy component of his instant offense. (Lechuga Sent. Tr. at 50-51.) It recognized that the nature of Lechuga's conviction might change the ordinary rules of determining his career offender status because the Guidelines make the criminal history computation provisions in section 4A1.2 applicable to the counting of convictions in section 4B1.1, U.S.S.G. § 4B1.2 cmt. n.3, but also except some racketeering activities from the standard instant offense analysis in section 1B1.3 and the prior sentence definition in section 4A1.2, U.S.S.G. § 2E1.1, cmt n.4. But despite Lechuga's extensive contrary assertions, the district court neither reached nor relied on this legal analysis. It instead determined that the conduct underlying Lechuga's prior sentences

could not have been related to his instant offense.[12] (Lechuga Sent. Tr. at 51.) This finding was based, in part, on the fact that the previous felony narcotics convictions were entered in 1990 and 1991, before the period of the racketeering and narcotics conspiracies alleged in the indictment—in or about late 1994 through 2006.

Indeed, Lechuga was hoisted on his own petard. He convinced the district court that, for purposes of his present offense, his involvement in the conspiracy began in the summer of 2002. Lechuga does not even endeavor to explain in his briefs to this Court how the district court's finding that his 1990 and 1991 convictions were unrelated to a conviction for racketeering and narcotics conspiracies commencing in 2002 amounts to clear error. We can perceive no infirmity in the district court's reasoning, let alone any that leaves us with a definite sense that a mistake was made. *See Salem*, 597 F.3d at 884. We will therefore affirm the sentence the district court imposed on Lechuga.

---

[12] On appeal, Lechuga argues that the district court "ultimately concluded that Lechuga was a Career Offender based on an exception contained in U.S.S.G. § 2E1.1, note 4." (Lechuga Br. at 33.) That argument baffles us for two reasons. First, he cites page 49 of the sentencing transcript for that proposition, yet page 49 contains no reference to the racketeering provision. Second, the sentencing court—in response to a question from the same counsel now representing Lechuga on appeal—specifically stated that it was *not* relying upon "the 2E1.1 exception" to make its career offender determination. (Lechuga Sent. Tr. at 51.)

*F.  Crowder's Separate Claim*

Crowder presents only one separate issue, alleging that the district court abused its discretion during the trial phase by admitting evidence that the government presented solely to inflame the jury. He argues that the challenged evidence, all of which was introduced by the government ostensibly to show the connection between Crowder and the Insane Deuce racketeering conspiracy, was either irrelevant or unduly prejudicial. Specifically, he complains that the evidence of where two of his victims were returning from—a Blockbuster video store—and who was also in the vehicle when he shot at them was inadmissible because it "painted a picture of a wholesome family outing disrupted by a violent shooting." (Crowder Br. at 5.) He also complains that the government presented evidence of him shooting a victim outside of a children's music recital when the location was immaterial, as well as testimony from a witness whose stated reason for recalling the date of another shooting was that she was returning a pan to her neighbor who had baked a cake for her after a death in her family. We review the district court's evidentiary decisions for abuse of discretion, disturbing its ruling only if no reasonable person could agree with them. *Dinga*, 609 F.3d at 908.

We find no merit to Crowder's arguments, and we dispose of them summarily. The government presented evidence of the shootings in order to show that he undertook the violent actions on behalf of the Insane Deuces

and that they were not mere random acts. Crowder believed each of his targets and victims to be Latin Kings. The shooting victims and other witnesses were called to identify Crowder as the shooter and to describe the circumstances of the shootings; those circumstances, in turn, provided the basis for forensic evidence linking Crowder to the gang through his use of Nation guns. The facts Crowder complains of were referred to only momentarily and were elicited to provide foundation for the witnesses' memories of the events. Further, we do not require parties to sterilize their testimony, purging it of all human detail; such details may be relevant and even essential to a jury's evaluation of the witnesses' credibility. Crowder "has not demonstrated that he was unfairly prejudiced, let alone that the district court abused its discretion by admitting" the testimony he challenges. *United States v. Hanna*, 630 F.3d 505, 511 (7th Cir. 2010). We will therefore affirm his conviction.

## G. *Handley's Separate Claim*s

Handley challenges only his sentence on appeal. As do many of his co-defendants, he contends that the district court failed to properly articulate its findings that his co-conspirators' conduct was relevant to his offense. He also contends that those findings were not based upon sufficient evidence. Because of these errors, he concludes, we must remand his case for resentencing. Once again, we review *de novo* the district court's application

of the sentencing guidelines, and we review its factual findings for clear error. *Nance,* 611 F.3d at 415.

Much like Lechuga claims to have done, Handley apparently tried to distance himself from the Insane Deuces during the summer of 2002. Though he was once a very active Deuce, Handley's participation waned so far that his fellow gang members issued a "smash on sight" or "SOS" order against him in late 2002 or early 2003, meaning that anyone who ran into him should physically beat him to punish his lack of involvement. The government did not present any evidence that Handley had actual knowledge of or personally participated in any acts of violence after the summer of 2002. Regardless, the government and the PSR recommended holding him accountable for the gang's subsequent violent acts. Handley argued, both in his objections to the PSR and during the sentencing hearing, that the circumstances showed he had not agreed to the full scope of the gang's racketeering conspiracy and that the violent acts during and after the summer of 2002 were not in furtherance of his jointly undertaken criminal activity. He also argued that the evidence linking him to any violent acts prior to that time was inherently unreliable due to the lack of cross-examination and many indications of poor credibility.

Handley's arguments did not convince the district court. The district court noted that, while no evidence showed Handley's direct participation in violence, the evidence did demonstrate that Handley knew of the

many violent acts, was present during multiple discussions of actions against rival gang members, and went along with it all without making known the fact that he allegedly abhorred violence. The district court found that Handley had been an Insane Deuce from the age of 14 in 1999 until 2003, when he first attempted to walk away according to his own post-arrest statement. The district court did, however, find that Handley unquestionably attempted to minimize his participation in the enterprise near the end of his membership. Based on Handley's post-arrest statement, cooperating witness testimony, and statements from one of the co-conspirators tried in the first trial, the district court found that Handley was involved in "certain missions" and that he was "a full member of the conspiracy, and that he [was] therefore responsible for the actions of the co-conspirators for which he could have . . . reasonably been aware of, and so it can be said that this was within his agreement with the gang." The court specifically found that the SOS order issued in 2003, far after the facts involved in the case under consideration. It therefore determined that, based on the relevant conduct of his co-conspirators, Handley's total offense level was 43. The district court confirmed that it was agreeing with the PSR and its guideline calculations.

On appeal, Handley renews his contention that the evidence upon which the district court based its findings was inherently unreliable. He also contends that the district court's relevant conduct findings were insufficient because they neither specified the scope of

Handley's jointly undertaken activity nor described those acts of his co-conspirators that furthered that joint undertaking. We reject the latter contention, as we are satisfied that the district court's findings—though terse—sufficiently articulated its reasons for finding the conduct of Handley's co-conspirators relevant to his offense. *See United States v. Singleton*, 548 F.3d 589, 593 (7th Cir. 2008) (describing our reluctance to reject a district court's relevant conduct findings for failure to invoke section 1B1.3's "magic words"). The district court's findings were informed both by counsel's arguments regarding the scope of the joint undertaking and by the calculations and reasoning in the PSR that it ultimately adopted during the sentencing hearing. *See United States v. Acosta*, 85 F.3d 275, 279-80 (7th Cir. 1996) (no clear error in implicit relevant conduct finding where record shows the district court considered and adopted PSR recommendations and government's reasoning regarding the facts related by the PSR).

The district court's statement, while perhaps ineloquently phrased, suggests that it found the scope of Handley's criminal undertaking to be coextensive with that of the entire racketeering enterprise. It undoubtedly found that the scope was broad enough to include the co-conspirators' criminal acts at issue. While the district court may not have defined the nebulous outermost limits of the scope of Handley's joint criminal activities, it did find that the scope at least included the acts of violence at issue and that his co-conspirators' acts were reasonably foreseeable to Handley.

The district court's statement quoted above does not suggest to us that the district court erroneously determined the scope of Handley's undertaking, as Handley suggests, by considering foreseeability first or exclusively. Further, Handley makes no argument that the violent acts in question were not in furtherance of the overall conspiracy. We therefore conclude that the district court's findings sufficed for purposes of section 1B1.3—provided that those findings rested on sufficient, reliable evidence. *See United States v. England*, 555 F.3d 616, 622 (7th Cir. 2009) ("[D]ue process requires that sentencing determinations be based on reliable evidence, not speculation or unfounded allegations.").

We turn, then, to Handley's contention that the evidence the district court relied on in making its relevant conduct findings was unreliable. Handley argues that the government relied on testimony from cooperating witnesses Becerra and Juan Osorio—who testified that Handley personally participated in some violent acts—despite the fact that their testimony was highly questionable and subject to considerable dispute. He also argues that the only evidence the district court appeared to rely on was a government-provided memorandum summarizing co-conspirator Fernando Delatorre's post-arrest statements and grand jury testimony. Handley asserts that the reliance was inherently unreasonable because the district court did not have time to review the memorandum in its entirety; because Delatorre, at that time, thought he stood to benefit from each allegation he made against his fellow gang members; because

Delatorre later implicitly repudiated the testimony by going to trial; because the sentencing court never had the opportunity to observe Delatorre; and because the memorandum comprised conclusory statements of verification from law enforcement officials. The district court did not enter any explicit findings as to the credibility of declarants or witnesses or as to what conflicting evidence it found to be reliable and supportive of its determinations. Handley therefore concludes that we must remand for resentencing.

We agree that we must remand for a new sentencing hearing "[i]f the district court relied on unreliable or inaccurate information in making its sentencing decision." *England*, 555 F.3d at 622. But we do not conclude that the district court did so here. Sentencing courts may "consider relevant information without regard to its admissibility under the rules of evidence . . . provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3. The district court was in a good position to judge the credibility of Becerra and Osorio, whose trial testimony implicated Handley in two attempted murders. The district court also heard a candid conversation between Delatorre and Rivera, covertly recorded long before Delatorre knew of the impending arrests, in which Delatorre implicated Handley in another attempted murder. Handley makes much of the district court's reference to the Delatorre memorandum during sentencing, but the district court was well informed regarding Delatorre's credibility issues. It knew that

Delatorre chose to stand trial instead of reaching a plea agreement after making his self-serving grand jury statements, and Handley's counsel extensively attacked Delatorre's credibility at the sentencing hearing. The memorandum also summarized the results of an investigation to verify Delatorre's statements; it was not merely a recitation of his testimony from the grand jury. Moreover, the district court also relied on Handley's own post-arrest statement in reaching its findings, including his concession of having been the Shorty Enforcer in 2002.

Handley's arguments do not convince us that all of the evidence before the sentencing court was inherently unreliable. The district court could have been more specific in outlining what evidence it relied upon and why it found that evidence particularly reliable. Still, the record suggests that the relevant evidence was reliable and that the district court adequately considered the conflicting evidence. *See United States v. Johnson*, 643 F.3d 545, 552 (7th Cir. 2011). We are not left with the definite and firm conviction that the district court erred in its relevant conduct determinations, so we will affirm Handley's sentence.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgments of the district court.