In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 20-1043

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANTOINE L. WALLACE,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Central District of Illinois.
No. 19-20023 — **Michael M. Mihm**, *Judge.*

———————————

ARGUED SEPTEMBER 24, 2020 — DECIDED MARCH 17, 2021

———————————

Before EASTERBROOK, MANION, and KANNE, *Circuit Judges.*

MANION, *Circuit Judge.* A jury convicted Antoine Wallace of being a felon in possession of a firearm. The judge sentenced him to 78 months in prison. Wallace asks us to vacate the conviction because there was insufficient evidence that he possessed a firearm. But an officer testified he saw Wallace pointing a silver handgun at him. Wallace challenges this testimony, but fails to overcome the standard of review, so we affirm the conviction.

Wallace also challenges his sentence for two reasons. First, he claims the district court erred by adding two criminal history points based on his 2015 Illinois conviction for fleeing police even though, his argument goes, he never served time in custody for that conviction. But he admits the record shows he did serve time for that conviction. Second, he claims the court erred by adding eight levels to his offense level based on his 2004 Illinois drug conviction. He argues that conviction is not a "controlled substance offense" under the guidelines because the Illinois statute was broader than federal law. But our recent precedent foreclosed this argument. So we affirm the sentence.

## I.

We view the occurrence facts in the light most favorable to the government.

Responding to a 911 call, officers approached a residence in Champaign, Illinois, late in the evening of October 14, 2018. Officer Kristensen took a position outside at the back of the residence. He saw someone walking in the backyard and shined a flashlight toward the figure: a black man wearing a black sweatshirt with writing on the arm and black pants. This man then squared his body, raised his right hand straight out in front, and pointed a silver handgun at Kristensen as though preparing to shoot, according to Kristensen's testimony.

Kristensen took cover by a corner of the house, identified himself as a police officer, and radioed other officers that he had seen someone with a gun in the backyard. The figure fled. Officers searched for him based on Kristensen's description of him. Officers heard a fence rattle in the area, in-

dicating the man ran east. Then he triggered a motion-detector light and the officers saw him.

Kristensen ordered him to the ground. He put his hands up but did not comply. His hands appeared empty. He wore the same clothes Kristensen had seen before on the figure in the backyard. He was out of breath and sweaty. Officers pinned him down, handcuffed him, and searched him but did not find a gun. He turned out to be Wallace.

Officers searched the area and found a silver handgun on the roof gutter of a nearby house. No twigs or debris were on the gun. It was visible from the ground. According to Kristensen, it looked like the gun Wallace pointed at him. It was fully loaded and had a round in the chamber.

## II.

The jury convicted Wallace of being a felon in possession of a firearm. Wallace challenges the denial of his Rule 29 motion for judgment of acquittal. We review the denial *de novo*, but in doing so we view the evidence in the light most favorable to the government to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019). We will not reweigh the evidence or reassess credibility. *United States v. Carrillo*, 435 F.3d 767, 775 (7th Cir. 2006).

The only element at issue here is whether Wallace knowingly possessed a gun. The jury heard evidence he did. Officer Kristensen testified he "saw a subject" walking outside near the house. Kristensen "illuminated the subject with [his] flashlight." Kristensen testified that his training taught him to check the subject's hands first because the hands

could possess a weapon so "the hands are what can kill you".[1] So Kristensen checked the subject's hands: "[W]hen I first illuminated him, he squared his body up to me, and I saw what appeared to be a silver handgun in his right hand. … [H]e raised it toward me in a shooting stance. … Straight arm, raising it up at your target."

Kristensen testified that during this encounter, he was "100 percent" sure he had seen a gun in the subject's hands.

Kristensen immediately jumped behind a corner for cover and unholstered his gun. He was concerned about being shot. He radioed the other officers that there was an armed subject in the backyard and he described the subject as a black male wearing a black sweatshirt with white writing on the arm and black pants.

Kristensen and other officers pursued the subject. As Kristensen approached a different house, he saw the same subject in the driveway, walking toward him. Kristensen pointed his gun at the subject and ordered him to the ground. But the subject continued walking. Two other officers grabbed his arms and took him to the ground. Less than a minute and a half elapsed between Kristensen's first sighting of the subject and his arrest.

Kristensen patted the subject down and then searched the area for the gun. Other officers also looked for the gun based on Kristensen's description of a "silver handgun."

As they searched, Kristensen misspoke to another officer. Kristensen said that as he illuminated the subject during their first encounter, Kristensen announced himself. This

---

[1] The location of this period is no mistake.

was false. Kristensen acknowledged on the witness stand that body-cam footage reveals he announced himself only after diving for cover. He explained the discrepancy to the jury: "It happened so fast, I didn't have time to give an announcement, but that's what we're trained to do, identify ourselves as police officers."

The government played Kristensen's body-cam footage for the jury. Kristensen testified he could see in the video a gun in Wallace's hand. And Kristensen reiterated that he also saw the gun with his own eyes during the first encounter.

The search for the gun took about 30 minutes. Kristensen admitted that during the search, he became "slightly" less confident he had seen a gun. He explained: "I had just had a gun pointed at me, and it's now unaccounted for."

An officer found a gun in the roof gutter of a nearby house. Kristensen testified the gun had the same appearance, approximate size, and color as the gun he saw pointed at him. The government showed a gun to the jury, and Kristensen tied it to the gutter and to Wallace's hand. Kristensen testified that as he sat in court, he was confident that on October 14, 2018, he saw Wallace holding the gun that became an exhibit: "I would say I was as confident as I was when it was pointed at me."

Kristensen testified that he learned the subject's name: Antoine Wallace. Kristensen identified Wallace in court. When he was arrested, Wallace was wearing the same clothing he wore when Kristensen first saw him.

The defense made some progress on cross. Kristensen seemed to retreat from his testimony that he could see a gun on the body-cam video. But he reiterated, again, that he saw

the gun during the event: "I saw it with my own eyes. … You can't tell what's in his hand on the body cam footage. That's why I'm here to testify from what I saw with my own eyes."

Kristensen also admitted, again, that he made a mistake when he told another officer that he announced his identity as a police officer earlier than he actually announced. Kristensen also acknowledged that he only saw the gun in the subject's hand for a brief amount of time. But he denied that there was a possibility the subject did not have a gun in his hand. Kristensen admitted he was not 100 percent certain that the gun in exhibit was the gun in the subject's hand.

So the jury heard Kristensen testify he saw Wallace holding a gun. Defense counsel had some basis to attempt to cast doubt on Kristensen's testimony. The officer was mistaken about when he announced his identity. He did not see Wallace's movements between their first and second encounters, less than a minute and a half apart. And Kristensen could not see a gun in the "blurry" video.

But the jury was free to assess his reliability and credibility. And the jury watched the video. The jury was entitled to accept Kristensen's explanation that he misspoke about the timing of his announcement. The jury was entitled to accept that eyes can see more details in person than on a blurry video. The jury was free to believe Kristensen. We will not reassess credibility or reweigh the evidence. The evidence was sufficient for a rational jury to find Wallace guilty.

### III.

Wallace argues the judge erred by adding two criminal history points based on his 2015 Illinois conviction for flee-

ing police. He argues this was error because he never served any time in custody on that case. He claims he bonded out the day he was arrested.

We review the judge's application of the sentencing guidelines for procedural error *de novo*, and we review factual findings for clear error.

The guidelines add two points for each prior sentence of imprisonment between and including 60 days and 13 months. U.S.S.G. § 4A1.1(a), (b). The guidelines add only one point for each prior sentence of imprisonment less than 60 days. *Id.* § 4A1.1(c). The guidelines define "sentence of imprisonment": "The term 'sentence of imprisonment' means a sentence of incarceration and refers to the maximum sentence imposed." *Id.* § 4A1.2(b).

In 2014, Wallace was charged in Illinois state court with fleeing police. The state court convicted him of that crime in 2015 in Champaign County Case No. 2014-CF-1249. The state court sentenced him to 136 days' incarceration: "Defendant is ordered to serve a period of incarceration of 136 days in the Champaign County Correctional Center. Defendant is to receive credit for 136 days previously served." (Sentencing Order, Aug. 31, 2015, Champaign Cty. Case No. 2014-CF-1249, App. 31 to Appellant's Br.)

Because 136 days is between 60 days and 13 months, the district judge added two points to Wallace's criminal history score. This resulted in a total of ten criminal history points, putting Wallace in criminal history category V. Combined with his total offense level of 22, Wallace faced a guidelines range of 77 to 96 months. Had the district judge added no points (or even only one point) to the criminal history score

based on the fleeing conviction, Wallace would have rested in criminal history category IV, and faced a guidelines range of 63 to 78 months.

Wallace argues this calculation was erroneous because he never actually served any jail time on the fleeing case.

The parties highlight different portions of the same guidelines application note. Wallace emphasizes the first part of application note 2: "To qualify as a sentence of imprisonment, the defendant must have actually served a period of imprisonment on such sentence … ." U.S.S.G. § 4A1.2, n.2.

But the government emphasizes the last part of the same note: "That is, criminal history points are based on the sentence pronounced, not the length of time actually served." *Id.*

Wallace argues he did not serve any time in custody on the 2015 fleeing conviction. He claims he bonded out the day of the arrest. He argues he spent 136 days in custody on a different case, which was ultimately dismissed. He argues the guidelines require actual service of imprisonment for a prior sentence to count toward the criminal history category. But he admits in his opening appellate brief that the fleeing judgment says he served 136 days on that case: "Wallace does not dispute that the state judgment *claims* that he served 136 days on -1249." Wallace argues that judgment was wrong, and is disproved by the state court's docket.

Wallace warns of a potential circuit split between us and the Sixth and Eleventh Circuits. *See United States v. Chatmon*, 565 Fed. Appx. 345, 349 (6th Cir. 2014) ("A sentenced [sic] imposed—but one for which the defendant does not serve time, perhaps because of suspension or stay—does not count

as a 'sentence of imprisonment' for criminal-history purposes, under §§ 4A1.1(a), (b) … ."); *United States v. Hall*, 531 F.3d 414, 419 (6th Cir. 2008) (defendant who receives full credit for time served on a different conviction does not "actually serve" any time for offense in question); *United States v. Butler*, 229 F.3d 1077, 1079 (11th Cir. 2000) (defendant did not "actually serve" time on sentence when he received credit for time served in a prior, totally unrelated case).

The government argues criminal history points are based on the sentence *pronounced*, not the length of time actually served. And the government points to our 2000 decision in *United States v. Staples*, where we affirmed a district court's assignment of two criminal history points based on a prior conviction and sentence of 250 days in jail even though that defendant received 250 days' credit for time previously served on an unrelated probation violation. 202 F.3d 992, 997–98 (7th Cir. 2000).

But here we need not revisit *Staples*, or wade into the nuances of the application note, or question our sister circuits. Here, it is sufficient that the state court's 2015 fleeing judgment says, "Defendant is to receive credit for 136 days previously served." And Wallace admits in his brief that he "does not dispute that the state judgment *claims* that he served 136 days on -1249." Wallace argues that judgment was wrong. But that is essentially a misplaced collateral attack on a state-court judgment. *See Custis v. United States*, 511 U.S. 485, 497 (1994); *McNair v. United States*, 962 F.3d 367, 367–68 (7th Cir. 2020); *Ryan v. United States*, 214 F.3d 877, 877–78 (7th Cir. 2000). So we find no error here.

**IV.**

Wallace also argues the court erred by adding eight levels to his offense level based on his 2004 Illinois drug conviction under 720 ILCS 570/407(b)(1). He argues that conviction is not a "controlled substance offense" under the guidelines because the Illinois statute was broader than federal law. But our recent precedent foreclosed this argument.

Wallace's base offense level went from 12 to 20 under U.S.S.G. § 2K2.1(a)(4)(A) because of his 2004 Illinois drug conviction. That guidelines section says that the base offense level is 20 if the defendant committed the instant offense after "sustaining one felony conviction of either a crime of violence or a controlled substance offense … ."

The guidelines define "controlled substance offense":

> The term "controlled substance offense" means an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

U.S.S.G. § 4B1.2(b). The parties agree that this definition applies. *See* U.S.S.G. § 2K2.1, n.1.

Wallace argues his 2004 Illinois drug conviction is not a "controlled substance offense" under the guidelines because the state law is broader than the federal definition. His argument runs like this. The phrase "controlled substance" in U.S.S.G. § 4B1.2(b) refers only to substances in the federal

Controlled Substances Act. The Illinois statute of prior conviction is indivisible. When a state statute is indivisible, and punishes conduct not covered by the federal enhancement provision, a conviction under that state statute cannot enhance a federal sentence under that provision. *See Descamps v. United States*, 570 U.S. 254, 277–78 (2013). The Illinois statute criminalizes the positional isomer of cocaine, which is not a controlled substance under federal law. The Illinois statute also permits conviction for a larger swath of analog substances than federal law does. So the Illinois statute is broader than the federal definition. So, under the categorical approach, the prior conviction under the Illinois statute cannot raise the current offense level via § 2K2.1(a)(4)(A).

In his brief, Wallace noted that a similar issue was pending before us in *United States v. Ruth* and *United States v. Nebinger*. We recently resolved both cases.

*Ruth* foreclosed Wallace's arguments. We concluded there was "no textual basis to engraft the federal Controlled Substances Act's definition of 'controlled substance' into the career-offender guideline." *Ruth*, 966 F.3d 642, 654 (7th Cir. 2020). The Sentencing Commission knew how to cross-reference federal statutory definitions in the guidelines. But § 4B1.2(b) "does not incorporate, cross-reference, or in any way refer to the Controlled Substances Act." *Ruth*, 966 F.3d at 651.

Section 4B1.2(b) defines "controlled substance offense" broadly, "and the definition is most plainly read to include state-law offenses related to controlled or counterfeit substances punishable by imprisonment for a term exceeding one year." *Ruth*, 966 F.3d at 654 (internal quotation marks omitted). There is no textual reason to narrow the phrase to

the Controlled Substances Act's definition. So we are left with the natural meaning of "controlled substance." We quoted a dictionary definition in *Ruth*: "A controlled substance is generally understood to be 'any of a category of behavior-altering or addictive drugs, as heroin or cocaine, whose possession and use are restricted by law.'" *Id.* at 654 (quoting *controlled substance*, The Random House Dictionary of the English Language (2d ed. 1987)). So Wallace's assertion that we "have no controlling authority on whether 'controlled substance' in U.S.S.G. § 4B1.2(b) means 'a substance controlled in the Controlled Substances Act,' or something broader" is no longer true after *Ruth*. And the fatal flaw in Wallace's logic—assuming that "controlled substance offense" in § 4B1.2(b) is coterminous with the Controlled Substances Act—is the same as the fatal flaw in Ruth's logic.[2]

Given the natural meaning of "controlled substance," Wallace's 2004 Illinois drug conviction is a controlled substance offense according to the guidelines. Thus, the judge did not err in using a base offense level of 20.[3]

In his citation of additional authority, Wallace acknowledges that *Ruth* defines "controlled substance" for guidelines purposes using the "natural meaning" of the phrase, and not using the federal Controlled Substances Act. Wal-

---

[2] Maybe it was always strange to think § 4B1.2(b) limited *controlled substance* to those proscribed by the federal Controlled Substances Act when that section specifically references "federal *or state* law." (Emphasis added.) But we leave that aside.

[3] As we did in *Ruth*, we recognize that there is already a circuit split on this issue. *See United States v. Bautista*, No. 19-10448, 2021 WL 769601, at *3 (9th Cir. Feb. 26, 2021) (collecting cases); *Ruth*, 966 F.3d at 653; *United States v. Hudson*, 618 F.3d 700, 704 (7th Cir. 2010).

lace disagrees with *Ruth*'s definition and cites foreign cases. But neither Wallace's disagreement nor the foreign cases control us.

But Wallace does make an interesting argument. He says that even under *Ruth*'s "natural meaning" definition of "controlled substance offense" as "behavior-altering or addictive drugs, as heroin or cocaine, whose possession and use are restricted by law," the Illinois statute of Wallace's prior conviction is *still* overbroad under the categorical approach because that statute bans positional isomers of cocaine. He argues it is "highly unlikely" that positional isomers of cocaine are psychoactive. So, the argument goes, it is highly unlikely they alter behavior. So they do not fit the "natural meaning" of "controlled substance." So the Illinois statute of prior conviction cannot serve as a predicate under the guidelines.

But Wallace's argument fails for three reasons. One, *Ruth* itself dealt with the Illinois statute banning positional isomers of cocaine. So *Ruth* already decided that positional isomers of cocaine fit the natural meaning of "controlled substance." Two, even if *Ruth* had not been that specific, we know Illinois law expressly controlled positional isomers of cocaine, so they fit the natural meaning of "controlled substance" and we should not speculate about whether they alter behavior. Three, there is no reason to think *Ruth*'s quotation of a Random House Dictionary definition of "controlled substance" is the only possible way to say the natural meaning of the phrase. And there is no reason to think *Ruth's* quotation establishes an exclusive list of technical alternative elements that must be satisfied. *Ruth* itself contains no such

indications. We could have used a different dictionary in *Ruth* just as well.[4]

## V.

The evidence sufficiently supported Wallace's conviction. The judge did not err in calculating Wallace's criminal history category or base offense level. We affirm.

---

[4] We recently resolved *United States v. Nebinger*, 987 F.3d 734 (7th Cir. 2021). That decision does not alter our conclusion here.